In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-1372

MARK G. WEINBERG,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 1139—**Arlander Keys**, *Magistrate Judge.*

ARGUED SEPTEMBER 25, 2002—DECIDED NOVEMBER 20, 2002

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff-appellant Mark Weinberg brought a suit challenging the constitutionality of Chicago's peddling law after being threatened with arrest for violating the ordinance. Weinberg argued the law, which prohibits peddling on public sidewalks in certain areas of the city, is unconstitutional under the First Amendment of the United States Constitution. Both parties moved for summary judgment and the district court granted summary judgment in favor of the City of Chicago. Weinberg appeals, arguing the district court erred in granting summary judgment and that the peddling ordinance is unconstitutional. Finding that the ordinance

is not a proper time, place, and manner restriction and is an impermissible prior restraint on free speech, we reverse the district court's decision.

## BACKGROUND

Mark Weinberg wrote and published a book entitled *Career Misconduct: The Story of Bill Wirtz's Greed, Corruption, and the Betrayal of Blackhawk Fans*, which, as is evident from the title, takes a highly critical look at Chicago Blackhawks owner Bill Wirtz. Weinberg decided to sell the book in what he determined to be an atmosphere highly conducive to sales: the United Center, home of the Chicago Blackhawks professional hockey team.

Mr. Weinberg is no stranger to selling his wares outside the United Center and its forerunner, the Chicago Stadium. From 1991 through 1997 Weinberg published and sold a magazine which, similar to *Career Misconduct*, negatively portrayed Wirtz and his ownership tactics. During this time Weinberg sold his magazine without incident or interference from authorities.

Beginning in December 2000, Weinberg began selling his criticisms of Wirtz in book format, charging $13.00 per copy. For approximately two months, Weinberg sold the book on the public sidewalks outside the United Center undisturbed. But on the evening of February 14, 2001, Chicago police officers informed Weinberg that he must stop selling his book outside the United Center, explaining that he was in violation of the City's peddling ordinance.

The section at issue, 4-244-147 of Chicago's Municipal Code (the "peddling ordinance"), provides as follows:

> No person shall peddle merchandise of any type on any portion of the public way within 1,000 feet of the United Center. A person holding a valid peddlers' li-

cense may peddle merchandise while on private property within 1,000 feet of the United Center only from a cart, table or temporary stand on private property without obstructing the public way, and pursuant to prior written permission from the property owner to do so. The provisions of this section shall be in addition to any other limitation on or regulation of peddlers. Any person who violates any provision of this section shall be fined not less than $ 200.00 nor more than $500.00 for each offense, and each day such violation shall continue shall be deemed a separate offense.

In addition, as part of the City's peddling ordinance, a separate provision, § 10-8-520, provides as follows:

No person, other than a licensed peddler, as by the provisions of Chapter 4-244 of this Code shall sell, offer or expose for sale, or solicit any person to purchase any article or service whatsoever, except newspapers, on any public way.

The Chicago City Council enacted the ordinance to alleviate traffic congestion and maintain pedestrian safety around the United Center. It also enacted similar restrictions around other large stadiums throughout Chicago.

Confronted with the threat of arrest, Weinberg ceased selling the book on the public sidewalks outside the United Center. Then Weinberg sought and obtained a temporary restraining order which permitted him to resume book sales outside the United Center and the parties agreed to have the case transferred to a magistrate judge. Both parties filed motions for summary judgment. The court denied Weinberg's motion but granted summary judgment on all counts for the City, finding that the ordinance did not violate the First Amendment. Weinberg appealed, claiming the ordinance violates his free speech rights. He bases his First Amendment attack on the Chi-

cago ordinance on a myriad of theories, contending the law does not apply to book sellers, is not a reasonable time, place, and manner restriction, is void for vagueness, and violates the doctrine of prior restraint. Each of these is addressed in turn.

## ANALYSIS

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. Amend. I. The Supreme Court recognized in *Gitlow v. New York*, 268 U.S. 652, 666 (1925), that this provision also applies to state governments under the Fourteenth Amendment. That the appellant sells his book for profit does not change the First Amendment analysis. "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. National Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988). *See also Ayres v. City of Chicago*, 125 F.3d 1010, 1014 (7th Cir. 1997) ("there is no question that the T-shirts are a medium of expression prima facie protected by the free-speech clause of the First Amendment, and they do not lose their protection by being sold rather than given away."). We review a summary judgment determination as well as any questions of constitutional law under the de novo standard of review.

Mr. Weinberg wishes to sell his book on the public sidewalks surrounding the United Center. Public sidewalks come under the designation of a traditional public forum. *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). "[P]ublic streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Id*. *See also Hague v. CIO*, 307 U.S. 496, 515 (1939). When regulating First Amendment activity in a public forum the government has a difficult burden to carry. *Perry Educ.*

*Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). We have noted that "[g]iven their greater importance to the free flow of ideas, public fora receive greater constitutional protection from speech restrictions." *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1297 (7th Cir. 1996). Through this lens we now consider each of Weinberg's claims.

I. *Interpreting § 4-244-147*

Weinberg first argues that the ordinance at issue is inapplicable to First Amendment activity such as selling a book. Inherent in this point of contention is Weinberg's claim that printed material such as books cannot be included under the ordinance's definition of "goods, wares [and] merchandise." We will construe the municipality's law under state law. *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 507-08 (7th Cir. 1998). Illinois law states that "[w]here clear and unambiguous, statutory language must be enforced as enacted, and a court may not depart from its plain language by reading into it exceptions [or] limitations." *People ex rel. Devine v. $30,700.00 United States Currency*, 766 N.E.2d 1084, 1089 (Ill. 2002).

In making this argument, Weinberg fails to grasp that the plain language of the ordinance unambiguously states "no person shall peddle merchandise of any type on any portion of the public way within 1,000 feet of the United Center." Chicago Municipal Code § 4-244-147.[1] This language could not be more clear as to what is prohibited.

---

[1] Its newspaper exemption is equally clear and unambiguous: "No person . . . shall sell, offer or expose for sale, or solicit any person to purchase any article or service whatsoever, except newspapers, on any public way." Chicago Municipal Code § 10-8-520.

While its constitutionality is another matter, it certainly covers appellant's conduct. These words evidence a clear intent by the Chicago City Council to prohibit the sale of anything other than newspapers outside the United Center. A book, like a newspaper, comes under the designation of a "good."[2] Merchandise is generally considered as any tangible item held out for sale. There is little doubt that the City intended to include books under the guise of "goods, wares [and] merchandise." Weinberg asks this Court to depart from the ordinance and extend the newspaper exemption to cover books. Applying Illinois law, we cannot come to any conclusion other than that book selling is prohibited while newspaper selling is not. Given these considerations, we reject Weinberg's argument that the ordinance does not apply to someone selling a book.

Weinberg next claims that the ordinance's exemption for newspaper sellers renders the law unconstitutional. He argues that the ordinance gives "special status" to newspapers over books. In effect, the ordinance singles out the sale of newspapers as being permitted while completely banning the sale of books. That the law exempts newspapers from restrictions but not books does not automatically mean the restriction is content-based. *Leathers v. Medlock,* 499 U.S. 439, 453 (1991), explains that differential treatment such as this is unconstitutional only if it "is directed at, or presents the danger of suppressing, particular ideas." In the case at bar, the suppression of particular ideas is not the consequence of enforcing this ordinance. Allowing some forms of expression while denying others does not signify a violation of the First Amendment. In *United States v. Kokinda*, 497 U.S. 720, 734 (1990), the Court noted that the activity of solicitation could be singled out and prohibited because of the dis-

---

[2]  A good is defined as "portable personal property." The American Heritage Dictionary 567 (2nd ed. 1991).

ruption it caused. According to the Court, "[s]olicitation requires action by those who would respond" whereas leafleting does not require one to do anything other than "mechanically . . . take it out of someone's hand." *Id.* The City of Chicago has similar concerns regarding public safety and traffic congestion around the United Center. Selling goods or merchandise would create a greater disruption than selling a 50¢ newspaper. The City's restriction on selling goods, with the exception of newspapers, is based on its concerns about the disruption and the effects on traffic congestion, not on suppressing ideas captured in book form.

In *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640 (1980), the Court considered the constitutionality of a Minnesota statute which permitted solicitation at a state fair, but restricted it to a fixed area. The Court held the limitation was a permissible restriction because it furthered the state interest of crowd control at the fair. Similarly, the different treatment of newspapers and books helps achieve the City's goal of limiting traffic congestion. A book purchase is usually more expensive, more time consuming, and more absorbing than a simple newspaper purchase. *See Graff v. City of Chicago*, 9 F.3d 1309, 1320 (7th Cir. 1993). Differential treatment between various forms of expression is permissible if it is done within the strictures of the First Amendment. We will respect a government's recognition that different forms of First Amendment activities have varying degrees of effects on its interests, as long as the government is not attempting to suppress a certain message or viewpoint. For these reasons, the ordinance's newspaper exemption does not render it unconstitutional.

II. *Time, Place, and Manner*

Weinberg next contends, citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), that the peddling law

is not content-neutral, not narrowly tailored to serve a significant government interest, and does not leave open ample alternative channels. We now consider whether the ordinance constitutes a reasonable time, place, and manner restriction.

The City claims that the ordinance is a mere restriction on the place in which one can sell goods. The City, of course, has every right to maintain limitations on where and when such activities may occur. However, these limitations must be able to coexist with the First Amendment. The restrictions must be justified without reference to the content of the regulated speech, narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

The first determination of the time, place, and manner analysis is whether the law in question is content-neutral. *Ward*, 491 U.S. at 791. Restrictions on speech are content-neutral if they are "justified without reference to the content of the regulated speech." *Renton v. Play Time Theaters, Inc.,* 475 U.S. 41, 48 (1986). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791.

Weinberg bases his contention that the ordinance is not content-neutral on the argument that the ordinance permits only "topical" speech while restricting all other types of speech. Weinberg points to the admission by the City that whether speech is considered "topical" is one of the criterion for determining whether something qualifies as a newspaper. Weinberg classifies his work as a "screed," which is quite different from the speech typically associated

with a newspaper. As a self-described screed, *Career Misconduct* documents evidence of Wirtz's alleged actions and presents it in an in depth manner that is not compatible with a newspaper format. Weinberg concludes that because his speech does not fall under the auspice of "topical" speech its prohibition is a content-based restriction.

Weinberg's argument on content neutrality fails for a number of reasons, the most notable of which is that the City did not adopt this regulation of speech "because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791. Weinberg's topical speech distinction ignores the fundamental framework of the *Ward* test. The peddling law makes no reference to the content of speech. It simply maintains a general prohibition on the sale of merchandise. As the City notes, the ordinance is wholly indifferent to any specific message or viewpoint. These regulations do not single out a certain message for different treatment. *Schultz v. City of Cumberland*, 228 F.3d 831, 840 (7th Cir. 2000). The peddling ordinance does not require one to consider the content of the speech, merely its format. Since the City treats those selling any type of book, regardless of its content, equally, we cannot agree that the ordinance is content-based.

In enacting this ordinance, the City proposed to limit congestion on the sidewalk. *See Potts v. City of Lafayette*, 121 F.3d 1106, 1111 (7th Cir. 1997). The purpose of the legislation, enacted years before Weinberg wrote his book, was not to silence Mr. Weinberg's message. The content of his message was of no interest to the City simply because he can still disseminate his message, albeit in a different format. While this may raise questions of whether the ordinance is narrowly tailored or leaves open ample alternatives, it does not raise concerns about the content neutrality of the ordinance. In addition, the fact that the ordinance adversely affects Weinberg while not

affecting a newspaper seller is of little persuasion because "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791. Since the relevant inquiries regarding content neutrality have been satisfied, we find that the peddling ordinance is content-neutral.

We now must consider whether the Chicago ordinance is narrowly tailored to achieve a significant governmental interest. There is no doubt the City has a legitimate interest in protecting its citizens and ensuring that its streets and sidewalks are safe for everyone. *International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 683-85 (1992). Its interest in maintaining the flow of pedestrian traffic is intertwined with the concern for public safety. *See Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650-51 (1981); *Jacobsen v. Petersen*, 728 F.Supp. 1415, 1420 (C.D.S.D. 1990).

Weinberg never explicitly questions the legitimacy of the state interest, likely because of the manifest weight of case law against him. *See*, *e.g.*, *Madsen v. Women's Health Center*, 512 U.S. 753, 768, (1994) (finding the state "has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks . . ."); *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981) (recognizing state interest in safety and convenience of citizens using public fora); *Ayres v. City of Chicago*, 125 F.3d 1010, 1015 (7th Cir. 1997) ("There are unquestionable benefits from regulating peddling, First Amendment or otherwise, [including] the control of congestion."). Instead, he challenges the sufficiency of evidence the government introduced justifying the necessity of the ordinance. In the context of a First Amendment challenge under the narrowly tailored test, the government has the burden of showing that there is evidence supporting its proffered

justification. *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 829 (7th Cir. 1999).

The City contends that because there is heavy traffic around the United Center, safety concerns justify the ordinance. On its face, this contention is hard to dispute. However, First Amendment rights demand more than mere facial assertions. It is true that the government may rely upon its own "real-world experience" in enacting regulations, *United States v. Kokinda*, 497 U.S. 720, 735 (1990), but the City cannot blindly invoke safety and congestion concerns without more.

Arguably, a government could cite safety concerns as its sole reason for banning all peddling on all sidewalks since a potential exists for crowding or congestion. The City presented testimony from police officers and security officials familiar with the United Center and its environs. These officials testified that the peddling of merchandise created congestion and that the enforcement of the ordinance essentially eliminated the traffic problems. This testimony conflicts with a videotape, shot at the request of the district court, of Weinberg selling his book outside the United Center. Both parties were present as the taping took place. The video shows no interference with any pedestrian traffic nor any congestion along the sidewalk. Moreover, the City fails to make a persuasive assessment of the tape or its worth. Despite this highly relevant and informative piece of evidence, the City wants to focus on the scant testimony of two arguably self-serving witnesses.

*Watseka v. Illinois Public Action Council,* 796 F.2d 1547 (7th Cir. 1986), *aff'd*, 479 U.S. 1048 (1987), offers guidance on the question of what constitutes sufficient evidence to prove the government's interest. In *Watseka*, we struck down an ordinance restricting solicitation for, among other reasons, lack of evidence supporting the city's substantial interest. Finding that the city failed to offer, other

than testimony from the Mayor, any substantive evidence that the ordinance prevented fraud, we noted "[s]uch a conclusory assertion by an interested party, particularly when unsupported by any statistics or firsthand knowledge of any actual crimes, lends little if any support to [the city's] claim." *Id*. at 1556. This language is applicable to the situation before us.

The City of Chicago has provided no objective evidence that traffic flow on the sidewalk or street is disrupted when Mr. Weinberg sells his book. The City offered no empirical studies, no police records, no reported injuries, nor evidence of any lawsuits filed. The City also fails to explain why there were no disturbances or problems when Weinberg was selling his book during the period prior to enforcement of the ordinance or after the lower court granted the temporary restraining order. Using a speech restrictive blanket with little or no factual justification flies in the face of preserving one of our most cherished rights. As Mr. Weinberg notes, the only evidence the City offered was based on speculation as to what might happen if booksellers could sell their books and the cumulative effect this might have on pedestrian traffic. This is problematic; "[w]e have never accepted mere conjecture as adequate to carry a First Amendment burden." *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 392 (2000). In addition, there was no evidence that other booksellers were present around the United Center. As in *Genusa v. Peoria*, 619 F.2d 1203, 1213 (7th Cir. 1980), nothing in the record supports the City's contention that Weinberg's activity caused serious congestion or disturbance. In fact, a thorough examination of the record, and the video in particular, reveals not only that there is little basis for the City's concerns, but also that the City's concerns are not justified at all.

In addition to the problems noted above, the ordinance contains other inconsistencies. The peddling ordinance

bans peddling, but leaves open activities such as leafleting, newspaper sales, street performances, and charitable solicitations. The City's position is that these categories of First Amendment activity somehow do not interfere with traffic congestion and pedestrian safety but selling a book has the potential to create chaos. Weinberg argues that this haphazard approach of permitting other forms of speech cannot advance the City's interest in maintaining traffic congestion. We agree. The recent Supreme Court decision, *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 122 S. Ct. 2080 (2002), offers some insight into this problem. *Watchtower* concerned a First Amendment challenge to an ordinance requiring solicitors to obtain a permit prior to engaging in door-to-door advocacy. The Court recognized that the town had a substantial interest in the prevention of fraud and crime. However, the Court noted that it must consider "whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve." *Id.* at 2089. The Court determined that the ordinance did not advance the town's interest in combating fraud because criminals would be able to avoid the permit requirements described in the statute. In finding the ordinance violated the First Amendment, the Court based its determination on the fact that the ordinance is "not tailored to the Village's stated interests." *Id.* at 2090. Similarly, the City of Chicago's inconsistent approach does not comport with its interests of maintaining traffic congestion.

We do not find that the City has no substantial interest in maintaining safety around the United Center. We do, however, find that the City has not appropriately demonstrated that Weinberg or any other peddler creates the problems the City asserts they cause.

Having found that the City has failed to show the ordinance advances a significant governmental interest, further

discussion of whether the ordinance is a reasonable time, place, and manner restriction is not mandatory. However, we believe the City's failure to meet the other elements of this test warrants our attention. Notwithstanding the City's inability to show that Weinberg, or any peddler for that matter, posed a threat to the safety and free flow of traffic surrounding the United Center, the peddling ordinance is not narrowly tailored. A regulation is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward,* 491 U.S. at 799. To satisfy the narrowly tailored test, an ordinance need not be the least restrictive method for achieving the government's goal. *Id.* at 797. Nevertheless, while a regulation does not have to be a perfect fit for the government's needs, it cannot substantially burden more speech than necessary. *Ward*, 491 U.S. at 800.

The lower court notes that the 1,000-foot ban encompasses a majority of the United Center's parking lot. It then finds that a restriction of this magnitude is justified because the ordinance bans peddling "in the area with the heaviest concentration of pedestrians and automobiles." *Weinberg v. City of Chicago*, 179 F. Supp. 2d 869, 878 (2002). What the district court failed to consider, however, is the effect such a large restriction has on peddlers. The 1,000-foot restriction overcompensates for an alleged congestion problem on the sidewalks around the United Center. The concerns behind the enactment and enforcement of the ordinance were to alleviate sidewalk congestion and prevent pedestrian traffic from spilling into the streets. While laudable goals, we cannot see how this can justify a restriction which prevents a peddler from selling his wares in large parking lots, less congested walkways, or sidewalks in less proximity to the United Center.

It appears that the City takes what amounts to be an all-or-nothing approach with peddlers. It avoids finding any kind of middle ground, such as a ban of less distance, a ban on peddling on certain narrow walkways, or a ban on peddling on the sidewalks immediately surrounding the United Center. Restrictions such as these would be less encompassing and less intrusive on First Amendment rights. A 1,000-foot ban is too great of a restriction; it effectively eliminates any opportunity for Mr. Weinberg to sell his book to patrons of the United Center. Mr. Weinberg notes that a 1,000-foot restriction eliminates "any meaningful avenue of distribution" of goods because most parking lots at the United Center are within a 1,000-foot radius of the building. The City's one-size-fits-all approach to restricting peddling cannot be reconciled with our First Amendment rights. *Cox v. Louisiana*, 379 U.S. 559 (1965).

Given these concerns, we conclude that the ordinance burdens substantially more speech than is necessary. Because the City bans peddling even in areas where congestion would not be a hazard, we cannot say the City applied a sufficiently narrow law necessary to promote its legitimate interest.

The last inquiry in determining whether the City's ordinance is a reasonable time, place, and manner restriction is whether the law leaves open ample alternative channels. An adequate alternative does not have to be the speaker's first choice. *Heffron*, 452 U.S. at 647; *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000). However, an alternative is not adequate if it "foreclose[s] a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Gresham,* 225 F.3d at 907. *See also Bery v. City of New York*, 97 F.3d 689, 698 (2d Cir. 1996) (holding that a total ban on sidewalk art does not leave open alternative means of communication because alternative display in galleries or museums would not reach the same audience).

In applying this test, we also consider the alternative channels of communication themselves. The mere existence of an alternative method of communication cannot be the end of the analysis. We must also give adequate consideration to whether the alternatives are ample. Whether an alternative is ample should be considered from the speaker's point of view. The City argues and the district court agreed that alternative channels of communication exist for Weinberg to disseminate his message. *Weinberg*, 179 F. Supp. 2d at 879. The district court noted that Weinberg can sell his book via the Internet, through bookstores, or in other areas of the city.[3] The City also points out that Weinberg still has the ability to disseminate his negative opinions of Mr. Wirtz outside the United Center. However, the simple fact that Weinberg is permitted to communicate his message elsewhere does not end our analysis if the intended message is rendered useless or is seriously burdened. *See, e.g.*, *City of Ladue v. Gilleo*, 512 U.S. 43, 56-57 (1994) (alternatives to posting signs on residential property such as posting signs on commercial property are inadequate because residents may wish to reach neighbors); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (seventy-five yard security zone prevented anti-war protestors' demonstration from reaching the intended audience, mil-

---

[3] The City adds additional alternatives in its brief, which include breaking up the book by chapter and selling it in newspaper fashion or handing his book out at no cost. The City relies upon *Friends of the Vietnam Veterans Memorial v. Kennedy*, 116 F.3d 495, 497 (D.C. Cir. 1997) and *One World One Family Now v. City & County of Honolulu*, 76 F.3d 1009, 1014-15 (9th Cir. 1996) as support for the alternative of giving the book away. However, as in *Ayres*, the magnitude of the no-peddling zone eliminates the possibility that Weinberg could sell his book in proximity to the prohibited area, making reliance on these cases suspect. *Ayres*, *supra*, 125 F.3d at 1016.

itary leaders); *Students Against Apartheid Coalition v. O'Neil*, 660 F. Supp. 333, 339-40 (W.D. Va. 1987) (school regulation prohibiting protest shanties on lawn of building where Board of Visitors meets is not rendered valid by permission to erect shanties in other places not visible to members of Board, who were the intended audience); *Dr. Martin Luther King, Jr. Movement, Inc. v. City of Chicago*, 419 F. Supp. 667, 674 (N.D. Ill. 1976) (permitting a parade route through black neighborhood not a sufficient alternative to a route through white neighborhood when white people were the intended audience).

As the Supreme Court has stated, "[t]he First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. National Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988). Mr. Weinberg is attempting to disseminate a message critical of the owner of the Chicago Blackhawks, Bill Wirtz. He has chosen to express his message in a self-authored book, for which he charges $13.00 a copy. His intended audience is Chicago Blackhawks fans. The most opportune time and place to reach this audience is outside the United Center, before and after Blackhawks home games. In evaluating First Amendment cases, we cannot check common sense at the door. As Weinberg notes, Blackhawk fans are a fundamentally different market than the market for bookstore readers or Internet users. The United Center is a unique location for the sale of Weinberg's book, especially since the target market for his book is Blackhawk fans.

In *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990), the Ninth Circuit held that "an alternative is not ample if the speaker is not permitted to reach the intended audience." Weinberg is unable to sell his book to Blackhawks fans entering the United Center. The ordinance prevents him from reaching his intended book purchasing audience. The alternatives require

Herculean efforts by Weinberg or his customers to complete the sale.[4] Thus, in light of Weinberg's customer base and his unique marketplace, we cannot say the alternatives are ample, precisely because his "ability to communicate effectively is threatened." *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984).

We recognize that "an adequate alternative does not have to be the speaker's first or best choice, or one that provides the same audience or impact for the speech." *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000). However, the City's onerous and inconsistent approach to First Amendment activity coupled with the substantially detrimental effects on Mr. Weinberg's free speech rights suggest to this Court that the ordinance does not provide ample alternatives.

The City does not support its bare assertion that a peddler within 1,000 feet of the United Center causes congestion problems. The ordinance is also not narrowly tailored and does not provide for ample alternatives. For these reasons, we find the peddling ordinance is not a reasonable time, place, and manner restriction.

III. *Vagueness*

Weinberg also claims that the peddling ordinance is unconstitutionally vague. He contends the ordinance is vague because it fails to define "newspaper." According to Weinberg, this failure to offer a clear definition of the term "newspaper" vests city officials with excessive discretion as to what they consider protected speech.

---

[4]  For example, the City suggests that Weinberg could distribute fliers advertising the sale of his book and include locations outside the 1000-foot radius of the United Center where the book may be purchased.

A law which "vests virtually complete discretion in the hands of the police fails to provide the minimal guidelines required for due process." *Gresham*, 225 F.3d 899 at 907 (internal quotes omitted). A law must have a "reasonable degree of clarity" such that anyone of ordinary intelligence can grasp its import. *Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984). "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993).

Weinberg never advances the notion that *Career Misconduct* is something other than a book. It clearly is not a newspaper. The term "newspaper" is a common word which leaves little doubt as to what it encompasses. In terms of its format, a newspaper shares none of the attributes of a book. A book is bound together by a cover while a newspaper is not. A newspaper is also generally published at regular intervals, larger in size, produced from inexpensive materials, and sold at a lower price. A legislature does not have to define every word in its legislation in order for it to satisfy a void for vagueness challenge. *Gardner v. Brown*, 5 F.3d 1456, 1459 (Fed. Cir. 1993), *aff'd*, 513 U.S. 115 (1994). The word "newspaper" has a readily ascertainable meaning which is simple and straightforward. *See Newsom v. Friedman*, 76 F.3d 813, 817 (7th Cir. 1996). For these reasons, we believe someone of common intelligence can discern the meaning of the word newspaper and therefore reject Weinberg's void for vagueness claim.

IV. *Prior Restraint*

Finally, Weinberg argues that the licensing procedures under the peddling ordinance give the City unfettered discretion in violation of the law of prior restraint. Before we can consider the substantive issue, we must first re-

solve the question of whether Weinberg has standing to challenge this provision of the law. The provisions of the ordinance relevant to the prior restraint challenge are as follows:

Section 10-8-520 provides:

> No person, other than a licensed peddler, as by the provisions of Chapter 4-244 of this Code shall sell, offer or expose for sale, or solicit any person to purchase any article or service whatsoever, except newspapers, on any public way.

Section 4-244-040 provides:

> Every individual who desires a license as a peddler shall make application therefor in conformity with the general requirements of this Code relating to application for licenses, and shall state the class of license sought. Such application shall also state in what commodity or article of merchandise such peddler desires or intends to deal.

Section 4-244-060 provides:

> The annual fee for peddlers' licenses shall be as set forth in Section 4-5-010.

The City contends that Weinberg has no standing to challenge the licensing scheme because he wishes to sell his book in an area where a license still would not permit him to sell his book. It argues that since the ordinance bans all peddling, without regard to licenses, Weinberg has suffered no injury because of the licensing requirement and that a decision invalidating this provision of the ordinance would not affect Weinberg. The City attempts to place hurdles in Weinberg's path where none exist. A challenge of this nature does not involve the conventional standing requirements. "In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it

delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 756 (1988) quoting *Freedman v. Maryland*, 380 U.S. 51, 56 (1965). In addition, the licensing scheme is intertwined with the 1,000-foot peddling ban. In striking down the 1,000-foot restriction, Weinberg still must apply for a license to peddle and face what he believes to be a procedure which vests unbridled discretion in city officials. As the district court noted, Weinberg did not have to subject himself to the requirements prescribed in the ordinance since it vested unbridled discretion with the city official. *Weinberg,* 179 F. Supp. 2d at 881, citing *Lakewood*, 486 U.S. at 755-56. Weinberg has standing because he will "suffer the vagaries of discretion" implicit in the licensing procedure. *Stokes v. Madison*, 930 F.2d 1163, 1168 (7th Cir. 1991). Having determined that Weinberg has standing to challenge this provision of the ordinance, we now will consider whether he has done so in a proper fashion.

Weinberg never made an attempt to apply for a permit. However, facial challenges are permitted where a licensing scheme vests discretion in the decision maker. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990). We permit these challenges because such schemes enable officials to self-censor protected expression. *Lakewood*, 486 U.S. at 759.

In *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755-56 (1988), the Court set forth the test to determine when a First Amendment facial challenge may be made to a licensing scheme. First, the law must confer the government with "substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Lakewood*, 486 U.S. at 759. The law must also have a "close enough nexus

to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id.*

The district court correctly found the ordinance vests "unfettered discretion" in city officials to issue peddling licenses and that they are devoid of criteria to guide officials. One need only glance at the licensing requirement provision of the ordinance and realize that there is absolutely nothing to guide city officials in determining whether to grant a permit. The Supreme Court has noted that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-51 (1969).

The noted absence of any criteria is in stark contrast to the ordinance we faced in *Graff v. City of Chicago*, 9 F.3d 1309 (7th Cir. 1993). In *Graff*, the commissioner of transportation had to consider six set criteria before deciding whether to grant permission to build a newsstand. *Id.* at 1317-18. We noted that the factors gave specific guidance to the commissioner and limited his discretion. The licensing ordinance before us offers officials no guidance or criteria in making the license determination. We therefore affirm the lower court's ruling that the ordinance fails to set any standards for the City to use and thus vests the City with an impermissible degree of discretion.

Having determined the first element of the *Lakewood* test, we now must consider whether the ordinance has a "close enough nexus to expression or to conduct commonly associated with expression." *Lakewood,* 486 U.S. at 759. Weinberg maintains that the lower court erred when it did not find the ordinance had a close nexus to freedom of expression. "In determining whether expressive conduct is at issue . . . [we look] to whether the activity in ques-

tion is commonly associated with expression." *Lakewood*, 486 U.S. at 769. We believe that the sale of a book is associated with expression. Weinberg took great pains to stress that his mission was not to profit from the book, but to disseminate his social protest of the Blackhawks owner, Bill Wirtz. *Career Misconduct* is the vehicle for that message. Mr. Weinberg does not peddle Blackhawks shirts, hockey merchandise, or even other books. He sells a single book with a single message exposing Mr. Wirtz's supposedly corrupt business and political dealings. The sale of a book is a form of expression. In *Lakewood*, the Supreme Court found that the circulation of newspapers constituted conduct commonly associated with expression. 486 U.S. at 760. In *Graff*, a plurality of judges found that the maintenance of a newspaper stand qualifies as conduct commonly associated with expression. "A newsstand is an instrument for the dissemination of expressive materials, and as such it falls within that special category of activities whose regulation implicates First Amendment values." *Graff*, 9 F.3d at 1328 (Flaum, J., concurring). These cases suggest that the written word, or anything closely associated with it, constitutes expression. That Weinberg places his message in book format cannot alter the outcome. If circulating newspapers or building a newspaper stand is associated with expression, selling a self-authored book with a political message constitutes expression. *See also Stokes v. Madison*, 930 F.2d 1163, 1168-69 (7th Cir. 1991). The sale of Weinberg's book is intertwined with his message. *See Graff*, 9 F.3d at 1337 (Cummings, J., dissenting) ("distribution is an inseparable part of expression."). Weinberg's speech is related to the book and to the sale of such a book. Prohibiting Weinberg from selling his book prevents the message of *Career Misconduct* from being disseminated.

The licensing ordinance targets First Amendment activities. Selling a book that has the purpose of expressing a

message is an activity which can be restricted through the licensing scheme. We cannot agree with the lower court's summation that the licensing ordinance presents "too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse." *Weinberg*, 179 F. Supp. 2d at 884. The licensing ordinance vests complete control in city officials with no criteria or guidance. We cannot agree that such an ordinance is too blunt, but rather find it to be the sharpest censorship tool possible. We also cannot agree with the lower court's ruling that the ordinance impacts First Amendment expression "incidentally." Given the considerations of this case, we find that the licensing ordinance affects people like Mr. Weinberg in more than a mere incidental fashion. The peddling ordinances directly and substantially impact First Amendment activity. The licensing procedure gives the City the ability to ban messages or products simply because of its disfavored status. We believe the licensing provision of the ordinance implicates speech and therefore creates the risk of censoring speech based upon who is applying for a license, and also find the ordinance has a close enough nexus to expression to justify a facial challenge.

Having determined that Weinberg may facially challenge Chicago's licensing procedure, we turn now to the merits. A prior restraint exists when a law gives "public officials the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Prior restraints are not per se unconstitutional, however, prior restraints are highly disfavored and presumed invalid. *New York Times Co. v. United States*, 403 U.S. 713,714 (1971). There are two forms of prior restraint. The first is a procedure that places "unbridled discretion in the hands of a government official" and might result in censorship. *FW/PBS*, 493 U.S. at 225. The second is a licensing procedure that

fails to place time limits within which a decision maker must issue the license. *Id.* at 226. We find the first form of prior restraint is applicable to the City's licensing scheme.

The City can deny a person's right to sell merchandise by denying a license to peddle, therefore, the licensing scheme is a prior restraint on expression. *See Ward*, 491 U.S. at 795 n.5. The licensing scheme enacted by Chicago places unbridled discretion in the hands of city officials which may result in censorship. *See FW/PBS*, 495 U.S. at 225-26. The City contends that the licensing procedure is a mere formality in which officials simply determine whether the applicant has conformed to applicable provisions in the ordinance. However, the lack of specificity in the procedure and the amount of discretion vested in the official lends itself to manipulation by the City. We cannot presume that officials will act in good faith and follow standards not explicitly contained in the ordinance. *Lakewood*, 486 U.S. at 770. There is no language in this procedure which curtails the discretion of City officials in granting a license. The City, via § 4-244-040, has the discretion to deny peddling permits. The licensing provision does not sufficiently curtail the discretion of City officials in granting licenses to peddle and thus violates the law of prior restraint.

## CONCLUSION

For the reasons discussed above we find the Chicago peddling ordinance unconstitutional because it is not a valid time, place, and manner restriction and because the licensing procedure violates the law of prior restraint. We reverse the decision of the district court and remand for the entry of an order not inconsistent with this opinion.

REVERSED AND REMANDED.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*