In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3233

LEFT FIELD MEDIA LLC,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO, ILLINOIS, and ELIAS VOULGARIS,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 C 3115 — **Jorge L. Alonso**, *Judge*.

ARGUED APRIL 4, 2016 — DECIDED MAY 23, 2016

Before EASTERBROOK and HAMILTON, *Circuit Judges*, and
PEPPER, *District Judge*.[*]

EASTERBROOK, *Circuit Judge*. Left Field Media publishes
*Chicago Baseball*, a magazine that produces four issues over
the course of a baseball season. Copies are sold for $2 out-
side Wrigley Field before the Chicago Cubs' home games.

[*] Of the Eastern District of Wisconsin, sitting by designation.

On the day of the Cubs' home opener in 2015, patrol officer Elias Voulgaris of Chicago's police force saw Matthew Smerge, Left Field's editor, selling the magazine at the corner of Clark and Addison streets. Voulgaris told Smerge to move across the street in order to comply with Chicago Municipal Code 4-244-140(b), which the parties call the Adjacent-Sidewalks Ordinance. Section 4-244-140(b) forbids all peddling on the streets adjacent to Wrigley Field. Smerge refused to move and was ticketed. Told that the next step would be an arrest, Smerge then crossed the street. A few days later Left Field sued under 42 U.S.C. §1983, contending that the Adjacent-Sidewalks Ordinance violates the First Amendment, applied to the states by the Fourteenth.

After the district court issued a temporary restraining order, Chicago agreed not to enforce the Adjacent-Sidewalks Ordinance while the district court considered Left Field's motion for a preliminary injunction. The 2015 season ran its course, and just as the playoffs began the district court declined to issue a preliminary injunction. 2015 U.S. Dist. LEXIS 135632 (N.D. Ill. Oct. 5, 2015). The 2016 season is underway, and the Cubs are doing well on the field. Left Field hopes to do as well on appeal.

The Adjacent-Sidewalks Ordinance provides:

No person shall peddle any merchandise on the sidewalk immediately adjacent to Wrigley Field; such sidewalk consisting of the north side of Addison Street, the east side of Clark Street, the south side of Waveland Avenue, and the west side of Sheffield Avenue. For purposes of this subsection (b), the term "sidewalk" shall mean that portion of the public way extending from the perimeter of the Wrigley Field stadium structure to the street curb or curb line.

A satellite picture of Wrigley Field and environs helps the reader to understand the ordinance:



In this picture, Clark is on the west, Addison on the south, Sheffield on the east, and Waveland on the north. As the picture shows, the park is surrounded by buildings (many of them residential), and an elevated railway (the CTA's Red Line) is half a block to the east. The district court found (citations omitted):

> [T]he area surrounding Wrigley Field indeed creates unique problems for the City … . [Wrigley Field] has a "very small footprint" compared with other sports arenas; most stadiums have about thirty acres of land to work with, as opposed to Wrigley Field's three acres. The area immediately surrounding the ballpark is bustling, with a high density of retail establishments,

rooftop businesses, and residences. There are no vast swaths of parking lots around Wrigley; the park is uniquely hemmed in, and the flow of pedestrian traffic to the stadium is confined to the public ways. The surrounding sidewalks around game times are so congested that people often walk in the streets alongside the sidewalks. Because of the stadium's position, a certain portion of the sidewalk on the north side of Addison between Clark and Sheffield is extremely narrow; only about three people at a time can pass in that section. The location of the CTA Addison Red Line stop contributes to the congestion because it is so close to the east side of the stadium. Alderman Tunney … testified that in the three-year period before the Adjacent-Sidewalks Ordinance was enacted in 2006, he had received complaints about peddlers and street performers blocking the entrances to the ballpark and making it difficult to safely walk in the area.

2015 U.S. Dist. LEXIS 135632 at *23–25. Left Field wants to take advantage of the narrow passages, so that people who try to enter the stadium must pass someone selling *Chicago Baseball*; the other side of the street is less crowded and so, Left Field insists, less desirable as a place to sell magazines. But the district court ruled that the throngs of people on narrow sidewalks justify the ordinance, even on the assumption that it must satisfy the Supreme Court's requirements for time, place, and manner regulation.

The Adjacent-Sidewalks Ordinance does not regulate speech. It regulates peddling, without regard to what the peddler sells, and under *United States v. O'Brien*, 391 U.S. 367 (1968), and many later decisions, regulation of conduct may proceed even if the person who wants to violate the legal rule proposes to express an idea. See also, e.g., *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) (no constitutional leaflet exception to regulation of all sales at a state fair); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984) (no constitutional expressive-

sleeping exception to rules banning camping in a public park). The ordinance applies as much to sales of bobblehead dolls and baseball jerseys as it does to the sale of printed matter—and because it regulates all sales alike, it is also content-neutral within the meaning of *Reed v. Gilbert*, 135 S. Ct. 2218 (2015).

Left Field asks us to disregard *O'Brien* and similar decisions in light of *Weinberg v. Chicago*, 310 F.3d 1029 (7th Cir. 2002), which held that cities sometimes must make exceptions to peddling-control ordinances in order to allow the sale of printed matter near sports venues. It is hard to see how a court of appeals can make exceptions to doctrine created by the Supreme Court. But we need not consider whether *Weinberg* should be reconsidered, as three members of this court have concluded. See 320 F.3d 682 (7th Cir. 2003) (dissenting from the denial of rehearing en banc). For *Weinberg* itself concluded only that there must be a publication exception allowing the sale of printed matter at a good distance from an arena—the ordinance at issue in *Weinberg* banned peddling within 1,000 feet of the United Center in Chicago.

*Weinberg* observed that restricting peddling in a stadium's crowded immediate environs would be a different matter. 310 F.3d at 1040–41. That decision practically invited the City to enact the sort of ordinance it did in 2006 for Wrigley Field, and *Weinberg* therefore does not offer any support for Left Field's assertion of a printed-matter exception to the Adjacent-Sidewalks Ordinance. Because the ordinance is neutral with respect to speech (both the *fact* of speech and the *content* of speech), the City need not bear any burden beyond supplying a rational basis—and the need to curtail activity

that delays entry and induces crowds to spill into the streets is more than enough.

Left Field maintains that the Adjacent-Sidewalks Ordinance is invalid because the City has an exception for newspapers. It points to Chicago Municipal Code 10-8-520, which excepts newspapers from the requirement that peddlers be licensed. (The Code forbids all peddling on the public ways but includes exceptions for newspapers and licensed peddlers.) Nothing in the language of §10-8-520 suggests that newspapers may be sold where some other ordinance prohibits *all* sales. Chicago's brief assures us that sales of newspapers on the streets immediately adjacent to Wrigley Field are treated just like sales of magazines and baseball caps. Left Field has not produced any evidence to the contrary.

There may be a problem, however, with a different kind of discriminatory enforcement. According to Left Field, police permit the Cubs' employees (and authorized vendors) to sell game programs and logo-bearing merchandise outside the ballpark. Chicago's lawyer told us at oral argument that this is proper, because the Cubs own two of the four adjacent sidewalks and sell only on their own property. The record does not show for certain just where the Cubs sell things (or, indeed, whether they sell anything at all on the adjacent sidewalks), and the district court did not make any findings on the subject. We do not blame the judge for this; Left Field did not press this point at the hearing on preliminary relief.

The Adjacent-Sidewalks Ordinance applies to all of the adjacent sidewalks, without regard to ownership—as one would expect if the goal is to reduce congestion and avoid people spilling into the streets to get around obstructions. So although we agree with the district court that Left Field has

not established an entitlement to a preliminary injunction, if it can show at a hearing on a request for permanent relief that the City favors the Cubs' official vendors over the sellers of other literature, then it will be entitled to some relief—if not an injunction against the Adjacent-Sidewalks Ordinance, then at least an injunction against discriminatory enforcement of that ordinance.

Left Field challenged not only the Adjacent-Sidewalks Ordinance but also Chicago Municipal Code 4-244-030, which the parties call the Peddlers'-License Ordinance. It requires licensure of anyone selling anything (with one exception), on streets anywhere in the City of Chicago. This means that people selling *Chicago Baseball* across the street from Wrigley Field, where they are free to operate, need a license. The exception to the Peddlers'-License Ordinance is the sale of newspapers. This is where §10-8-520 has an effect.

The exception for newspapers applied to the ordinance at issue in *Weinberg*, and we held that it did not invalidate that law. 310 F.3d at 1036. The district court relied on this part of *Weinberg* to reject Left Field's challenge to the Peddlers'-License Ordinance. But governing law has changed since *Weinberg*. After *Reed v. Gilbert*, *supra*, "[a]ny law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification." *Norton v. Springfield*, 806 F.3d 411, 412 (7th Cir. 2015). The Court in *Gilbert* wrote that "regulation of speech is content based if a law applies to particular speech because of the topic discussed *or* the idea or message expressed." 135 S. Ct. at 2227 (emphasis added). So a law that distinguishes discussion of baseball from discussion of politics, by classifying one kind of publication as a magazine and another as a newspaper, is at risk

under the approach of *Gilbert*. We do not say that a newspaper exception necessarily makes the Peddlers'-License Ordinance invalid; the Supreme Court has never dealt with the question whether a law that classifies publications by frequency independent of content is invalid just because different kinds of content may lead to a different frequency of publication. But the analysis of *Gilbert* reinforces the warning in *Lowe v. SEC*, 472 U.S. 181 (1985), that newspaper exceptions to generally applicable laws create difficult constitutional problems.

Quite aside from the newspaper exception, requiring a license for the distribution of literature is problematic under the First Amendment. See *Watchtower Bible & Tract Society of New York, Inc. v. Stratton*, 536 U.S. 150 (2002). Chicago observes that the literature being distributed in *Watchtower Bible* was given away rather than sold, which is true, and we do not doubt that Chicago may apply general zoning and business-licensing rules to bookstores and newspapers. See *Graff v. Chicago*, 9 F.3d 1309 (7th Cir. 1993) (en banc). The exception for newspapers makes general licensure harder to justify, however, and the Peddlers'-License Ordinance has additional terms that may bear especially heavily on quarterly magazines that sell for $2 on the street.

Although a bookstore or newspaper must have a general business license and satisfy zoning requirements, the City does not attempt to regulate who may be employed as a sales clerk. But the Peddlers'-License Ordinance does regulate who may sell *Chicago Baseball*. Left Field cannot secure 20 licenses and distribute them to its sales team for a home game. Instead each peddler must be licensed *personally*, which places a damper on an organization that relies on cas-

ual or daily labor. (The Cubs play only 81 home games a year during the regular season; selling *Chicago Baseball* during an hour or two before each game is not remotely a full-time job.) The $100 fee for a peddler's license, even if it covers no more than the City's costs of administering the program, is much higher per hour worked for a publication such as *Chicago Baseball* than for a business with a full-time staff—and it is a cost that newspapers (with the benefit of §10-8-520) and bookstores (with the benefit of fixed locations) need not bear.

Chicago tells us that licensing individual peddlers is essential because the police use the distinctive badges that peddlers must wear to ensure that a given peddler is authorized to sell and remits sales taxes. Chicago also tells us that the license helps control fraud in making pitches to customers. We don't get it. A visible badge does not ensure that a peddler pays taxes after finishing a day's sales. More than that, a peddler employed by an organization does not *owe* taxes. Left Field, not the sales staff, is responsible for collecting and remitting taxes. Nor do the police listen to the peddlers' pitches—and it is hard to see how one could identify fraud in the sale of a magazine. Could the police arrest a peddler for touting *Chicago Baseball* with the line "Step right up and learn everything you need to know about the Cubs"?

If an employer such as Left Field could acquire its own stock of badges (and the accompanying licenses) and distribute them to people who sell the magazine on a given day, the City's ends of identifying authorized sellers and collecting taxes would be at least as well served as by a program of individual licensing. And fraud, if any, could be attributed to Left Field, which as the employer would be responsible un-

der tort law. (Corporate licensing would of course affect the number of licenses issued, but we are taking Chicago at its word that the $100 fee is designed to cover costs, not to raise revenue.)

What the individual-licensing program does do is give Chicago control over who can sell *Chicago Baseball*, depriving the magazine of discretion that employers value. That would not be a problem if a license could be had by supplying a name and plunking down the fee. But that's not enough to get a peddler's license in Chicago, according to testimony by the supervisor of the City's Department of Business Affairs and Consumer Protection. Chicago will not issue licenses to people who owe state or local taxes or parking tickets or water bills. It will not issue licenses to people who are behind in child-support payments. It will not issue licenses to applicants who lack a residential address or a photo ID issued by the state. These requirements may make it hard for Left Field to hire the sort of casual, daily labor it needs to operate, for people without steady jobs are more likely than others to leave parking tickets and child-support unpaid or to lack a fixed address. Cutting these people off from a source of income may be counterproductive—that's not a First Amendment problem, of course, but it leaves us wondering just what this ordinance is expected to accomplish that will justify its potential effect on fringe publications such as *Chicago Baseball*. Yet at the same time as it cuts down the supply of labor on which *Chicago Baseball* relies, the City of Chicago undoubtedly has among its own employees hundreds of persons who have unpaid parking tickets or are behind on taxes or child support.

The Supreme Court held in *Zablocki v. Redhail*, 434 U.S. 374 (1978), that a state may not prohibit the marriage of persons who owe child support. It is impossible to imagine that the Court would countenance a rule limiting employment as a newspaper reporter, or a clerk in a bookstore, to persons who have paid all their parking tickets and other civil obligations. Chicago maintains that the Peddlers'-License Ordinance is different because it applies to all peddling, to peanuts and Cracker Jack as well as periodicals. But the pesky exception for newspapers means that this is not quite right, and the weakness of the justification for regulating individual peddlers (as opposed to requiring the employer to have a supply of licenses and require all vendors to wear ID tags) takes a further toll on this ordinance.

The district court did not discuss the person-specific nature of the Peddlers'-License Ordinance, the fact that it may bear especially heavily on publishers that require casual labor, or the fact that it may disqualify many participants in the casual-labor pool. These require attention at proceedings on Left Field's request for a permanent injunction. But despite these omissions we cannot say that the district court abused its discretion in declining to issue a preliminary injunction, because Left Field did not introduce evidence that would tend to show how seriously the Peddlers'-License Ordinance hobbles its business.

Indeed, we have some doubt whether the challenge to the Peddlers'-License Ordinance is ripe for decision. Neither Left Field nor any of its street sellers has ever applied for a peddler's license. Neither Left Field nor any of its street sellers has ever received a ticket for selling *Chicago Baseball* without a peddler's license. Maybe the police have decided

to treat *Chicago Baseball* as a "newspaper" for the purpose of the Peddlers'-License Ordinance, just as in *Lowe* the Supreme Court held that a regularly published investment newsletter is a "newspaper" for the purpose of 15 U.S.C. §80b–2(a)(11)(D), which exempts newspapers from any need to register as investment advisers.

If the police treat *Chicago Baseball* as a newspaper, then this dispute does not need judicial resolution—indeed, Left Field would not even have standing. See *Spokeo, Inc. v. Robins*, No. 13–1339 (U.S. May 16, 2016); *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014). Likewise if it turns out that *Chicago Baseball*'s vendors can get peddler's licenses without hassles. Until the judiciary knows whether the Peddlers'-License Ordinance applies to Left Field and crimps its business model, constitutional adjudication is unwarranted.

The order denying Left Field's motion for a preliminary injunction is affirmed. The district court now can consider any request for a new hearing and a permanent injunction.