**LEFT FIELD MEDIA LLC, Plaintiff,**

v.

**CITY OF CHICAGO and Elias Voulgaris, Chicago Police Commander, Defendants.**

**No. 15 C 3115**

United States District Court, N.D. Illinois, Eastern Division.

Signed October 05, 2015

Adele D. Nicholas, Nicholas Law Office, Mark G. Weinberg, Attorney at Law, Chicago, IL, Neil S. Ament, Law Office of Neil S. Ament, Highland Park, IL, for Plaintiff.

Michael J. Dolesh, Ellen Wight McLaughlin, Margaret R. Sobota, Thomas P. McNulty, City of Chicago, Department of Law, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

JORGE L. ALONSO, District Judge

Before the Court is (1) Magistrate Judge Mason's Report and Recommendation of July 29, 2015 [63] (as amended on August 28, 2015 solely to add citations to hearing transcripts [78]), which is adopted in its entirety; and (2) plaintiff's motion for a preliminary injunction [33], which is denied.

## BACKGROUND

Plaintiff, Left Field Media LLC ("Left Field"), is a company that publishes a magazine called *Chicago Baseball* that is issued four times per year during the major league baseball season. Left Field sells the magazine for $2.00 on the public ways surrounding Wrigley Field before Chicago Cubs home games. This suit arises out of the events that occurred on April 5, 2015, the day of the Cubs' 2015 home opener. Matthew Smerge, who owns Left Field and serves as the publisher and editor of *Chicago Baseball*, was selling the magazine on the public way at the northeast corner of Clark and Addison Streets when Chicago Police Commander

Elias Voulgaris approached Smerge and told him that he and his vendors had to move across the street and that Voulgaris would ticket any vendor he saw on the Cubs' side of the street. Despite this warning, Smerge continued to sell magazines from the same spot, and about a half-hour later, Voulgaris issued him a ticket for selling *Chicago Baseball* in a no-peddling zone and warned Smerge that if he did not move to the other side of the street, he would be arrested. Smerge then moved across the street, where Left Field alleges that it suffered reduced sales.

Three days later, on April 8, 2015, Left Field filed this action, which seeks injunctive, declaratory, and monetary relief against Voulgaris and the City of Chicago (the "City") for alleged violations of plaintiff's First Amendment rights. Plaintiff brings as-applied and facial challenges to three sections of the Chicago Municipal Code: (1) Section 4–244–140, which prohibits all peddling on the public ways adjacent to Wrigley Field (the "Adjacent–Sidewalks Ordinance," which Smerge was ticketed for violating, R. 72–3); (2) Section 4–244–030, which requires peddlers to first obtain a peddling license (the "Peddler's License Ordinance"); and (3) Section 10–8–520, which provides that no person other than a licensed peddler shall sell any article or service, except newspapers, on any public way. (R. 1, Compl.)

The day after filing this suit, plaintiff moved for a temporary restraining order ("TRO") to enjoin defendants from interfering with plaintiff's access to the public sidewalks adjacent to Wrigley Field for the purpose of selling *Chicago Baseball* during Cubs home games. (R. 5.) This Court granted the motion, entered a TRO, and referred the case to Magistrate Judge Mason for a preliminary injunction hearing. The TRO was then extended by agreement at times and most recently by this Court until its ruling on plaintiff's preliminary-injunction motion.

On June 16, July 10, and July 21, 2015, Judge Mason held an evidentiary hearing on plaintiff's motion for a preliminary injunction.[1] In its motion, plaintiff seeks to enjoin defendants from enforcing the Adjacent–Sidewalks Ordinance and the Peddler's License Ordinance. Judge Mason issued a Report and Recommendation on July 29, 2015, recommending that this Court deny plaintiff's motion.[2] (R. 63.) On August 13, 2015, plaintiff objected to Judge Mason's Report and Recommendation as provided by Federal Rule of Civil Procedure 72 and 28 U.S.C. § 636(b)(1). (R. 70.) On August 27, 2015, defendants responded to plaintiff's objections. (R. 76.)

## DISCUSSION

### A. Legal Standards

#### 1. Standard of Review

▮▮▮▮ "When a magistrate judge prepares a report and recommendation for a district court, the governing statute provides that the district court 'shall make a *de novo* determination' with respect to any contested matter." *Kanter v. C.I.R.*, 590 F.3d 410, 416 (7th Cir.2009) (quoting 28

---

1. Although there is no document on the case docket titled "Plaintiff's Motion for a Preliminary Injunction," Document Number 33, which is titled "Plaintiff's Memorandum in Support of Its Motion for a Preliminary Injunction," was docketed as a motion and has been designated as a pending motion, and the Court and the parties have treated it as a motion.

2. On August 28, 2015, Judge Mason issued an Amended Report and Recommendation ("Am. R & R") to add citations to the proper page numbers of the official hearing transcripts, which were not yet available at the time the original Report and Recommendation was issued. (R. 78, Am. R & R at 1144 n.1.)

U.S.C. § 636(b)). The Court of Appeals has observed:

> De novo review requires the district judge to decide the case based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion. The district judge is free, and encouraged, to consider all of the available information about the case when making this independent decision. A district judge may be persuaded by the reasoning of a magistrate judge or a special master while still engaging in an independent decision-making process.

*Mendez v. Republic Bank,* 725 F.3d 651, 661 (7th Cir.2013) (citing *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). The district judge makes the ultimate decision to adopt, reject, or modify the magistrate judge's recommendation. *Schur v. L.A. Weight Loss Ctrs., Inc.,* 577 F.3d 752, 760 (7th Cir. 2009); *see also* Fed.R.Civ.P. 72.

### 2. Preliminary Injunctions

■ " 'A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation,* 430 F.3d 432, 437 (7th Cir.2005) (brackets and emphasis omitted) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)). It is "often seen as a way to maintain the *status quo* until merits issues can be resolved at trial." *Michigan v. U.S. Army Corps of Eng'rs,* 667 F.3d 765, 783 (7th Cir.2011). The Court of Appeals has described the proper analysis as follows:

> In our circuit, a district court engages in a two-step analysis to decide whether such relief is warranted. In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunc-

tive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits. If the movant makes the required threshold showing, then the court proceeds to the second phase, in which it considers: (4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the "public interest"). The court weighs the balance of potential harms on a "sliding scale" against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor.

■ *Turnell v. CentiMark Corp.,* 796 F.3d 656, 661–62 (7th Cir.2015). The threshold for establishing likelihood of success is relatively low. *U.S. Army Corps,* 667 F.3d at 782. In First Amendment cases like this one, the likelihood of success is usually the decisive factor because the loss of First Amendment freedoms "unquestionably constitutes irreparable injury," and "injunctions protecting First Amendment freedoms are always in the public interest." *Wis. Right To Life, Inc. v. Barland,* 751 F.3d 804, 830 (7th Cir. 2014).

### B. The Adjacent–Sidewalks Ordinance (§ 4–244–140)

Section 4–244–140, the Adjacent–Sidewalks Ordinance, provides as follows in relevant part:

> No person shall peddle any merchandise on the sidewalk immediately adjacent to Wrigley Field; such sidewalk consisting of the north side of Addison Street, the east side of Clark Street, the south side

of Waveland Avenue, and the west side of Sheffield Avenue. For purposes of this subsection (b), the term "sidewalk" shall mean that portion of the public way extending from the perimeter of the Wrigley Field stadium structure to the street curb or curb line.

Chi., Ill., Mun. Code § 4–244–140(b).[3]

 Sidewalks like the ones outside Wrigley Field "are traditional public forums where the exercise of First Amendment rights is often most vibrant. As the Supreme Court has described the rationale for promoting broad access to public forums, 'streets, sidewalks, parks and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.'" *Marcavage v. City of Chi.,* 659 F.3d 626, 630 (7th Cir.2011) (quoting *Carey v. Brown,* 447 U.S. 455, 460, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)). "However, the fact that such rights cannot be denied 'broadly and absolutely' does not mean they cannot be curtailed at all. On the contrary, the time, place, and manner of a speaker's activities can be regulated without violating the First Amendment so long as the restrictions are (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication." *Id.* (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)).

After hearing testimony and reviewing the parties' exhibits and briefs, Judge Mason determined that the Adjacent-Sidewalks Ordinance (hereinafter, in this section of the opinion, the "Ordinance") is content neutral on its face and a reason-

able "time, place, or manner" regulation under the test set forth in *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).[4] In Judge Mason's view, the Ordinance is valid under the First Amendment, so plaintiff has not shown a likelihood of success on the merits.

### 1. Content Neutrality

Plaintiff, citing *Reed v. Town of Gilbert, Arizona,* —— U.S. ——, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015) and *Norton v. City of Springfield, Illinois* ("*Norton II*"), No. 35–3581, 2015 WL 4714073 (7th Cir. Aug. 7, 2015), first challenges Judge Mason's determination that the Ordinance is content neutral.

Some background about *Reed* and *Norton* is required. In its first decision in the *Norton* proceedings, the Court of Appeals affirmed the district court's denial of plaintiffs' motion to preliminarily enjoin enforcement of the City of Springfield's panhandling ordinance. *Norton v. City of Springfield, Ill.* ("*Norton I*"), 768 F.3d 713 (7th Cir.2014). In *Norton I,* the Court reasoned that the panhandling ordinance does not draw lines based on the content of anyone's speech. *Id.* at 714, 717–18. On June 18, 2015, the Supreme Court issued *Reed.* Shortly thereafter, in *Norton II,* the Court of Appeals granted plaintiffs' petition for rehearing, applied *Reed* to the City of Springfield's panhandling ordinance, reversed the judgment of the district court, and remanded the case for entry of an appropriate injunction. The Court explained:

> Plaintiffs contend that the ordinance's principal rule—barring oral requests for money now but not regulating requests for money later—is a form of content discrimination.

---

**3.** This particular provision of this section was enacted in 2006. (7/10/15 Hr'g Tr. 102–03.)

**4.** As Judge Mason noted, defendants do not argue that the Court should apply the standard of scrutiny for "commercial speech."

The panel disagreed with that submission for several reasons. We observed that the ordinance does not interfere with the marketplace for ideas, that it does not practice viewpoint discrimination, and that the distinctions that plaintiffs call content discrimination appear to be efforts to make the ordinance less restrictive, which should be a mark in its favor. We summed up: "The Court has classified two kinds of regulations as content-based. One is regulation that restricts speech because of the ideas it conveys. The other is regulation that restricts speech because the government disapproves of its message. It is hard to see an anti-panhandling ordinance as entailing either kind of discrimination." 768 F.3d at 717 (citations omitted). We classified the ordinance as one regulating by subject matter rather than content or viewpoint.

*Reed* understands content discrimination differently. It wrote that "regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." 135 S.Ct. at 2227 (emphasis added). Springfield's ordinance regulates "because of the topic discussed". The Town of Gilbert, Arizona, justified its sign ordinance in part by contending, as Springfield also does, that the ordinance is neutral with respect to ideas and viewpoints. The majority in *Reed* found that insufficient: "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." 135 S.Ct. at 2228. It added: "a speech regulation targeted at specific subject matter is content

based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 2230.

Three Justices concurred only in the judgment in *Reed.* 135 S.Ct. at 2236–39 (Kagan, J., joined by Ginsburg & Breyer, JJ.). Like our original opinion in this case, these Justices thought that the absence of an effort to burden unpopular ideas implies the absence of content discrimination. But the majority held otherwise; that's why these three Justices wrote separately. The majority opinion in *Reed* effectively abolishes any distinction between content regulation and subject-matter regulation. Any law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification.

Our observation, 768 F.3d at 717, that Springfield has attempted to write a narrowly tailored ordinance now pertains to the justification stage of the analysis rather than the classification stage. But Springfield has not contended that its ordinance is justified, if it indeed represents content discrimination. As we said at the outset, the parties have agreed that the ordinance stands or falls on the answer to the question whether it is a form of content discrimination. *Reed* requires a positive answer.

*Norton II*, 2015 WL 4714073, at *1–2.

Plaintiff argues that Judge Mason's "formulation of the meaning of 'content-based,'" reliance on *Norton I*, and determination that the Adjacent–Sidewalks Ordinance is content neutral was mistaken in light of *Reed.* (R. 70, Pl.'s Objections at 2.)[5] In plaintiff's view, "the City's scheme of favoring one organ of communication (newspapers) over all others (magazines,

---

5. As defendants note (R. 76, Defs.' Resp. at 2–3 n.2), plaintiff's first mention of *Reed* in these proceedings appears in its Objections, although the decision was issued weeks before

the second and third sessions of the preliminary injunction hearing. Although *Reed* was not issued prior to the conclusion of briefing

books, pamphlets, leaflets) amounts to content-based discrimination." (*Id.* at 3.)

As Judge Mason pointed out, plaintiff's motion does not seek to enjoin the enforcement of the newspaper exemption in § 10–8–520. (R. 78, Am. R & R at 1145 n.4.) Yet plaintiff's sole basis for its argument that the Adjacent–Sidewalks Ordinance is content-based is the entirely separate newspaper exemption. (R. 70, Pl.'s Objections at 2–6.) By invoking the City's "scheme," plaintiff assumes, without discussion, that the newspaper exemption in § 10–8–520 applies to the Adjacent–Sidewalks Ordinance. Defendants, for their part, note that Judge Mason as well as other courts [6] have assumed that the Ordinance exempts newspaper peddlers, and defendants contend that "whether such a carve-out exists is a question of state law properly decided by the Illinois courts" and "is not squarely presented in this case [because] Plaintiff does not contend that its publication is a newspaper." (R. 76, Defs.' Resp. at 6 n.5.)

■ The Court agrees that plaintiff has not "squarely presented" the issue, but not because it fails to argue that *Chicago Baseball* is a newspaper. After all, the Court of Appeals addressed the issue in *Weinberg* even though it appears that the plaintiff did not present such an argument. (Rather, the plaintiff argued that his publi-

cation was a book and that the Court should have extended the exemption to books.) Because plaintiff fails to develop an argument for treating the newspaper exemption as part of the Adjacent–Sidewalks Ordinance, the Court will not do so. There is no indication in the language of the Ordinance that it incorporates or is subject to § 108–520. And even if there were, plaintiff has not explained why, if § 10–8–520 were found to be unconstitutional, the appropriate remedy would extend any further than the invalidation of that particular section.[7] Plaintiff's motion, however, does not seek to enjoin enforcement of § 10–8520.

■ Pursuant to the framework set out in *Reed*, the Court must first determine whether the Adjacent–Sidewalks Ordinance is content neutral on its face. *See* 135 S.Ct. at 2228. The Ordinance is facially content neutral—it simply bans the peddling of any merchandise on the sidewalks immediately adjacent to Wrigley Field—so it clears this hurdle. Furthermore, even if the newspaper exemption can be considered part of the Adjacent–Sidewalks Ordinance, its inclusion would not render the Ordinance content-based under *Reed* and *Norton II*. The Supreme Court stated in *Reed* that "a speech regulation is content based if the law applies to particular

on plaintiff's motion, plaintiff did not seek to file any supplemental brief to address the decision.

6. Defendants cite only *Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir.2002), in which the Court of Appeals treated the newspaper exemption in § 10–8–520 as part of the City's ordinance that prohibited the peddling of "merchandise of any type on any portion of the public way within 1,000 feet of the United Center," § 4–244–147. *Id.* at 1034–36. Unlike the Adjacent–Sidewalks Ordinance, § 4–244–147 contained a sentence stating that "[t]he provisions of this section shall be in addition to any other limitation on or regulation of peddlers."

7. Typically, when a statutory scheme has a constitutional flaw, the reviewing court will sever the offending portion from the remaining constitutional portions of the law. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact.") (citations omitted).

speech because of the topic discussed or the idea or message expressed." *Id.* at 2231. In *Norton II*, the Court of Appeals summarized *Reed*'s teaching as follows: "Any law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification." 2015 WL 4714073, at *2. Assuming that the Adjacent–Sidewalks Ordinance is a restriction on speech and not merely a regulation of conduct, it does not draw any distinctions based on the meaning of speech, the topic discussed, or any message expressed. The newspaper exemption distinguishes between forms of publications, not their content. In his *Reed* concurrence, which was joined by Justices Kennedy and Sotomayor, Justice Alito provided a list of sign regulations that would not be content based, including "[r]ules regulating the size of signs" and "[r]ules distinguishing between signs with fixed messages and electronic signs with messages that change." 135 S.Ct. at 2233. In the Court's view, the newspaper exemption is akin to these types of regulations. The Court is unpersuaded by plaintiff's assertions that "distinctions among organs of communication are content-based by their very nature" and that the exemption is "speaker-based" and a "subtle" form of content discrimination. (R. 70, Pl.'s Objections at 3–4.) Even if the newspaper exemption were properly considered part of the Adjacent–Sidewalks Ordinance, it does not amount to a content-based distinction.

◼ In the second step of the *Reed* analysis, a facially content-neutral law can still be categorized as content based if it cannot be "'justified without reference to the content of the regulated speech'" or if it was adopted by the government "'because of disagreement with the message the speech conveys.'" 135 S.Ct. at 2227 (brackets omitted) (quoting *Ward,* 491 U.S. at 791, 109 S.Ct. 2746). The City's justification for the Adjacent–Sidewalks Ordinance—its interest in alleviating congestion and ensuring public safety on the sidewalks and streets surrounding Wrigley Field—is content neutral. Plaintiff again focuses exclusively on the newspaper exemption, which the Court does not consider to be part of the Adjacent–Sidewalks Ordinance; nonetheless, the Court will assume that it is for the sake of argument. There is no evidence (and plaintiff does not argue) that the City adopted the exemption because of a disagreement with anyone's message. Plaintiff does contend that the City has failed to present a valid content-neutral justification for the exemption. (R. 70, Pl.'s Objections at 5.) But Judge Mason's reliance on *Weinberg,* in which the Court of Appeals stated that "[s]elling goods or merchandise would create a greater disruption than selling a 50¢ newspaper," 310 F.3d at 1036, was not improper. Plaintiff's real dispute is with the Court of Appeals's conclusions in *Weinberg,* which this Court must follow.[8]

---

8. Plaintiff attempts to distinguish its $2.00 magazine from the book at issue in *Weinberg* by emphasizing *Weinberg's* observation that "[a] book purchase is usually more expensive, more time consuming, and more absorbing than a simple newspaper purchase." (R. 70, Pl.'s Objections at 5 (citing *Weinberg,* 310 F.3d at 1036).) As to the possibly "time consuming" and "absorbing" nature of the purchase, plaintiff's argument is belied by the testimony of Smerge, who acknowledged that on occasion he has conversations with magazine purchasers. (*See, e.g.,* 6/16/15 Hr'g Tr.

81 ("If they say they like the magazine and they ask a couple of questions, I may divulge that I am the editor."; *id.* 86–87 (explaining that there are times when people ask about the difference between *Chicago Baseball* and the Cubs' program and that Smerge responds by providing "a short, concise explanation of what the difference is"); *id.* 134 ("We actually have regulars who are devoted enough that they keep buying the same edition.... I've had people tell me that they support what we do, we're an independent, honest voice; and they buy it every time they come....").)

*Reed* and *Norton II* clarified the content-neutrality inquiry, but they do not change the outcome. This Court's conclusion is the same as Judge Mason's: the Adjacent–Sidewalks Ordinance is content neutral. Thus, the Court does not apply strict scrutiny. *See McCullen v. Coakley,* —— U.S. ——, 134 S.Ct. 2518, 2534, 189 L.Ed.2d 502 (2014).

## 2. Narrow Tailoring and Alternative Channels

■ The Court turns to whether the Adjacent–Sidewalks Ordinance is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels for communication of [ ] information." *Id.* at 2529 (citing *Ward,* 491 U.S. at 791, 109 S.Ct. 2746). "For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 2535 (quoting *Ward,* 491 U.S. at 799, 109 S.Ct. 2746). Such a regulation need not be the least restrictive or least intrusive means of serving the government's interests, but it nevertheless cannot burden substantially more speech than is necessary to achieve those interests. *Id.*

Judge Mason determined that the Ordinance is narrowly tailored. The evidence is that the Adjacent–Sidewalks ordinance was enacted to alleviate congestion and ensure public safety on the sidewalks next to Wrigley Field. Judge Mason found that the testimony and record evidence support the City's assertion that the Ordinance in fact advances these interests, and he concluded that the Ordinance does not burden substantially more speech than is necessary to achieve them. (R. 78, Am. R & R at 1150–55.)

■ Plaintiff does not expressly dispute the significance of the City's interests, but attempts to recharacterize them and the evidence, asserting that "[i]t is certainly a valid state interest to prevent obstruction of pedestrian traffic, but it is not a valid state interest to seek to rid the streets of simple, everyday 'congestion.'" (R. 70, Pl.'s Objections at 14.) In plaintiff's view, " 'obstruction' can and must be distinguished from the mere existence of 'congestion' on a public forum." (*Id.*) [9] Pedestrian traffic, however, is not a phenomenon confined to just two possibilities, obstruction and the lack thereof. [10] Human experience tells us that such traffic is on a continuum; the more congestion, the more likely it is that obstruction will occur. In any event, the Supreme Court has repeatedly recognized that the government has a strong interest in "promoting the free flow of traffic" on public streets and sidewalks. *McCullen,* 134 S.Ct. at 2535; *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 768 (1994). [11]

---

9. In another section of its brief, plaintiff makes a somewhat contradictory point: "[O]ne must ask, where does 'congestion' start and the hustle, bustle, and energy of a busy city sidewalk end?" (R. 70, Pl.'s Objections at 9.) So perhaps plaintiff in fact does dispute the significance of the City's interest. That position would be contrary to controlling case law. *See, e.g., McCullen,* 134 S.Ct. at 2535.

10. Moreover, the evidence here does not show mere "simple, everyday congestion," as discussed below.

11. Plaintiff also attempts to narrow the government's interest to "address[ing] any alleged harms of obstruction posed by speech peddlers." (R. 70, Pl.'s Objections at 7.) The Adjacent–Sidewalks Ordinance applies to all peddlers, not just "speech peddlers." And in examining the government's justification for its regulation, the Court does not look only at plaintiff's activity. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 652 (1981) (recognizing that groups other than the plaintiffs must be considered when assessing the government's interest in avoiding congestion and maintaining the orderly

■ Plaintiff faults Judge Mason's rejection of its suggestion that the City has a variety of alternative methods of advancing its interests. (R. 70, Pl.'s Objections at 7–8; R. 78, Am. R & R at 1154; R. 33, Pl.'s Mem. at 18.) In determining that these alternatives may not enable the City to advance its interests, Judge Mason cited the "unique footprint" of Wrigley Field and the undisputed congestion in its immediate vicinity. (R. 78, Am. R & R at 1154.) Plaintiff submits that "uniqueness" is not "an appropriate limiting principle" and that Wrigley Field is "not in fact 'unique,' at least not in respects relevant to this lawsuit[,]" because "the width of the pedestrian walkways surrounding Wrigley Field is roughly consistent with that available around other sports stadiums in Chicago." [12] (R. 70, Pl.'s Objections at 9–10.)

The evidence is that the area surrounding Wrigley Field indeed creates unique problems for the City, as Judge Mason found. Alderman Tom Tunney testified that Wrigley Field has a "very small footprint" compared with other sports arenas; most stadiums have about thirty acres of land to work with, as opposed to Wrigley Field's three acres. (7/10/15 Hr'g Tr. 100.) The area immediately surrounding the ballpark is bustling, with a high density of

retail establishments, rooftop businesses, and residences. There are no vast swaths of parking lots around Wrigley; the park is uniquely hemmed in, and the flow of pedestrian traffic to the stadium is confined to the public ways. (R. 74–1, Defs.' Ex. 1(a).) The surrounding sidewalks around game times are so congested that people often walk in the streets alongside the sidewalks. (R. 74–2, Defs.' Ex. 2, Videos.) Because of the stadium's position, a certain portion of the sidewalk on the north side of Addison between Clark and Sheffield is extremely narrow; only about three people at a time can pass in that section. (*Id.* Ex. 2(b).) The location of the CTA Addison Red Line stop contributes to the congestion because it is so close to the east side of the stadium. (7/10/15 Hr'g Tr. 133.) Alderman Tunney also testified that in the three-year period before the Adjacent–Sidewalks Ordinance was enacted in 2006, he had received complaints about peddlers and street performers blocking the entrances to the ballpark and making it difficult to safely walk in the area. (*Id.* 102, 105–06.) Judge Mason did not, as plaintiff submits, (R. 70, Pl.'s Objections at 11), give "undue emphasis" to the problems posed by Wrigley Field's unique characteristics.

movement of state-fair patrons on fairgrounds).

12. On this point, plaintiff submits the Declaration of Neil Ament, one of its attorneys, who states that he used a tape measure to measure the public and private ways surrounding Wrigley Field. He sets out his measurements and calculations of the sidewalk widths there and compares them to the widths of the sidewalks around U.S. Cellular Field and the United Center. (He fails to state the basis for his statements about the widths of the sidewalks surrounding those two venues.) (R. 70–1, Decl. of Neil S. Ament.) Plaintiff did not present this evidence to Judge Mason, and defendants object to the Declaration on the grounds that it was not previously disclosed, lacks a foundation, and runs afoul of the

advocate-witness rule. (R. 76, Defs.' Resp. at 23–24.) Although this Court's review is *de novo*, a party generally cannot raise new arguments and evidence that were not presented to the magistrate judge. *See United States v. Melgar*, 227 F.3d 1038, 1040 (7th Cir. 2000); *Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir. 1995) (a *de novo* determination is not the same as a *de novo* hearing). The Court will not consider the Declaration. Plaintiff had every opportunity to present such evidence to Judge Mason and failed to do so. And even if the Court considered the Declaration, it is unavailing for the reasons explained below. The area surrounding Wrigley Field is unique regardless of whether the widths of its adjacent sidewalks are comparable to those of the sidewalks surrounding U.S. Cellular Field or the United Center.

▓ Plaintiff contends that "[i]f Wrigley Field were truly 'unique' in such a way that a wholesale ban on speech peddling were justified, there would surely be some evidence of problems occurring as a result of Plaintiff's vendors' presence there." (R. 70, Pl.'s Objections at 10–11.) This evidence is in the record. Given the City's significant interest in alleviating sidewalk congestion and ensuring public safety, the Court disagrees with plaintiff that the only possible "problems" are confined to "accidents, injuries or arrests resulting from speech peddlers' presence." (R. 70, Pl.'s Objections at 11–12.) *See Marcavage*, 659 F.3d at 630–31 & n.2 (discussing the pedestrian traffic on the sidewalks surrounding Wrigley Field during the closing ceremonies of the Gay Games and the protestor plaintiffs' interference with that traffic and noting that "[t]hough the plaintiffs argue they were not blocking the sidewalks, their own video recordings taken at the events plainly show pedestrians walking around them while they remain stationary.").[13] Alderman Tunney and Sergeant Evangelos Hitiris testified about the congested sidewalks around Wrigley Field. Defendants's videos depict *Chicago Baseball* vendors contributing to the congestion by attempting to sell the magazine on the sidewalks immediately adjacent to Wrigley Field, while pedestrians must walk around them. (R. 74–2, Defs.' Ex. 2, Videos.) Smerge also conceded that people sometimes have to walk around him when he is making sales or having conversations with customers. (6/16/15 Hr'g Tr. 86–87.)

▓ Plaintiff asserts that the City has failed to show, as required by *McCullen*, that the alternative measures plaintiff has identified "would fail to achieve the government's interests" and "not simply that

the chosen route is easier." *See* 134 S.Ct. at 2540. The Court disagrees. There is unrebutted evidence that plaintiff's proposed alternatives—enforcing the disorderly-conduct ordinance, passing an ordinance targeting sidewalk obstruction, or passing an ordinance limiting the number of peddlers around Wrigley Field or requiring a certain amount of space between them, or prohibiting peddling that blocks egress or ingress to the stadium—would be ineffective and unworkable due to the police department's limited manpower. Sergeant Hitiris, who is in charge of a seven-officer unit that is assigned to the Wrigley Field area for game days and nights as well as concerts, testified that the police do not have the manpower to enable them to "sit every five feet to determine whether somebody is being legal or not." (7/21/15 Hr'g Tr. 6–7, 31, 65–66.) The area Hitiris's unit patrols is much larger than just the block on which the stadium sits; it is bordered by Grace Street on the north, Roscoe Street on the south, Racine Avenue on the west, and Halsted Street on the east. (*Id.* 6.) The officers are responsible for coordinating with stadium security personnel, being watchful for security threats, and responding to "key policing issues" on game days, such as unlawful peddling, scalping, fighting, theft, drinking on the public way, and public indecency and urination. (*Id.* 9–10, 14–15.) In 2014, Hitiris's unit issued 968 tickets (in lieu of arrests) on game days for various offenses in the Wrigley Field area, including tickets for unlawful peddling. (*Id.* 11.) A few hours prior to a game, there can be 10,000 to 15,000 people in the area; by the start of a game, there can be more than 40,000. (*Id.* 12.)

---

13. Plaintiff's argument to the contrary, which attempts to distinguish between the act of "obstructing" others and that of "allow[ing]" people to freely and easily walk around" oneself, is thus unpersuasive. (*See* R. 70, Pl.'s Objections at 14–15.)

■ Given these conditions, the Court agrees with defendants that the alternatives plaintiff proposes would not enable the City to serve its interests. Plaintiff asserts repeatedly that "there are alternatives the City could use," (R. 70, Pl.'s Objections at 7–8), but under *Ward*, the mere existence of alternatives is not dispositive. 491 U.S. at 798–99, 109 S.Ct. 2746 (a regulation of the time, place, or manner of protected speech must be narrowly tailored but "need not be the least restrictive or least intrusive means of doing so"). Of course, there must be a "close fit" between ends and means, *McCullen*, 134 S.Ct. at 2534, and that is satisfied here.[14] As Judge Mason explained, the Ordinance's no-peddling zone is quite limited in geographic scope. It applies only to the public sidewalks immediately adjacent to the stadium, and, since the City has recently permanently vacated those sidewalks on Waveland and Sheffield Avenues, (7/10/15 Hr'g Tr. 122),[15] applies only to the sidewalks next to the stadium on Clark and Addison Streets (the west and south sides of Wrigley Field).[16] This is the kind of "middle ground" that *Weinberg* suggested in dicta would be a "narrowly tailored" regulation of peddling outside a stadium. 310 F.3d at 1040 ("[T]he City takes what amounts to be an all-or-nothing approach with peddlers [with a ban on peddling within 1000 feet of the United Center]. It avoids finding any kind of middle ground, such as a ban of less distance; a ban on peddling on certain narrow walkways, or a ban on peddling on the sidewalks immedi-

ately surrounding the United Center. Restrictions such as these would be less encompassing and less intrusive on First Amendment rights."). The ban on peddling on the sidewalks immediately adjacent to Wrigley Field is narrowly tailored to address the congestion and safety problems that occur when tens of thousands of people are funneled along a crowded streetscape to a stadium occupying a single block. Judge Mason engaged in a thorough and reasoned analysis of narrow tailoring with which this Court agrees.

■ This Court also agrees with Judge Mason's determination that the Adjacent–Sidewalks Ordinance leaves open ample alternative communication channels. Peddling is permitted on the sidewalks and corners immediately across from the ballpark. The evidence shows that pedestrians visiting the area come from all directions, so plaintiff's vendors and other vendors can station themselves across the street and still have immediate access to communicate with those people. The only pedestrians that may not have to cross Clark, Addison, Sheffield, or Waveland to arrive at the park are those exiting buses or taxis. (R. 78, Am. R & R at 1154.) Peddlers can still be visible to and within earshot of this audience. Plaintiff's vendors wear yellow jerseys, and Smerge testified that he repeats the price of *Chicago Baseball* "in a loud tone of voice" and projects his voice so as to be heard by people crossing the street approaching the stadium. (6/16/15 Hr'g Tr. 30, 32–33.)

14. Plaintiff contends that Judge Mason disregarded evidence of the Ordinance's "underinclusiveness" in that the City permits other activities that cause sidewalk congestion. (R. 70, Pl.'s Objections at 15–16.) As Judge Mason found, the evidence does not indicate that all of the activities cited by plaintiff in its memorandum are permitted to take place on sidewalks, and the fact that the Ordinance does not address every possible cause for congestion does not undermine the City's inter-

est. (R. 78, Am. R & R at 1152–53.) This is not a case where the underinclusiveness of the Ordinance raises doubts about whether it serves the City's asserted interests.

15. Those sidewalks are now the Cubs' property.

16. Plaintiff's argument that the peddling ban amounts to "four City blocks" is inaccurate. (See R. 70, Pl.'s Objections at 16.)

■ On this issue, plaintiff "stands by its prior briefing," in which it argued that it is "best able to each its audience by having its vendors stand on the sidewalks adjacent to the stadium." (R. 70, Pl.'s Objections at 16; R. 33, Pl.'s Mem. Supp. Mot. at 19.)[17] "An adequate alternative," however, "does not have to be the speaker's first or best choice, or one that provides the same audience or impact for the speech." *Gresham v. Peterson,* 225 F.3d 899, 906 (7th Cir.2000) (citing *Heffron,* 452 U.S. at 647, 101 S.Ct. 2559). Here, plaintiff has the same audience, and it does not have to change its sales tactics to communicate with that audience. The Adjacent–Sidewalks Ordinance leaves open ample, realistic alternative channels for both plaintiff's vendors and other peddlers.

Plaintiff has failed to show a likelihood of success on the merits on its claim that the Adjacent–Sidewalks Ordinance violates the First Amendment. Accordingly, the Court need not discuss the other elements of the preliminary-injunction analysis.

### C. The Peddler's License Ordinance (§ 4–244–030)

■ Section 4–244–030, the Peddler's License Ordinance (hereinafter, the "Ordinance"), states: "It shall be unlawful for any person to engage in the business of a peddler without first having obtained a street peddler [ ] license under this chapter." Chi., Ill., Mun. Code § 4–244030(a). Judge Mason concluded that plaintiff failed

to show a likelihood of success on the merits on its claim that this Ordinance violates the First Amendment.

Plaintiff argues that Judge Mason's reasoning is flawed for several reasons. (R. 70, Pl.'s Objections at 17.) The first is that the Ordinance is content-based and thus a prior restraint.[18] Here, plaintiff hangs its hat again solely on the newspaper exemption. Even if the Peddler's License Ordinance incorporates the newspaper exemption in § 10–8–520, the exemption would be severable from the license requirement, as discussed above, were the exemption constitutionally invalid under *Reed.* In any event, for the reasons the Court has discussed, the exemption does not render the Peddler's License Ordinance content-based. The exemption is not directed at a topic, idea, or message.

■ The Ordinance is not an invalid prior restraint. A prior restraint is "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority." *Weinberg,* 310 F.3d at 1044 (citing *Shuttlesworth v. City of Birmingham, Ala.,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)). Judge Mason correctly found that the Ordinance affords the City "minimal, if any, discretion in choosing to grant or deny an application for a peddler's license." (R. 78, Am. R & R at

17. Plaintiff's citation to *McCullen* in support of this argument is misplaced. In *McCullen,* the Supreme Court held that a statute creating a 35–foot "buffer zone" around abortion clinics was not narrowly tailored. 134 S.Ct. at 2540–41. The plaintiffs in *McCullen* were individuals who attempted to dissuade women from having abortions by engaging in personal conversations and relying on "a caring demeanor, a calm tone of voice, and direct eye contact during these exchanges." *Id.* at 2527. The Court's holding was based in part on the fact that the buffer zones compromised

the plaintiffs' "ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'" *Id.* at 2535. This kind of consideration is not present here. Plaintiff's vendors try to attract attention by being loud.

18. Judge Mason specifically noted that plaintiff did not present a "prior restraint" argument to him. (R. 78, Am. R & R at 1155 n.17.) Because defendants do not argue that it has been waived, this Court will consider the argument.

1156.) Plaintiff contends that the Ordinance gives the City "unfettered discretion" because it does not define the term "newspaper." (R. 70, Pl.'s Objections at 18.) Whether someone sells a newspaper, however, has nothing to do with whether they are issued a peddler's license when they apply for one. Chi., Ill. Mun. Code § 4–244–041; 7/10/15 Hr'g Tr. 23, 32–33, 40, 45–46. As for enforcement of the Ordinance, plaintiff fails to cite to any evidence in the record that supports its argument that the City has an "arbitrary and shifting" definition of "newspaper." (R. 70, Pl.'s Objections at 18–19.)

Plaintiff also maintains that the Ordinance is a "single-speaker licensing scheme" and thus an unreasonable time, place, or manner restriction. (*Id.* at 20.) Defendants correctly point out that although plaintiff complains that Judge Mason's Report and Recommendation "does not address this issue at all," plaintiff never raised the argument prior to filing its Objections. (R. 76, Defs.' Resp. at 18.) It is therefore waived. *See Melgar*, 227 F.3d at 1040; *United States v. City of Rock Island, Ill.*, 182 F.Supp.2d 690, 694 (C.D.Ill.2001) ("The review procedure [of magistrate judges' rulings] is not an opportunity for counsel to present new arguments when the ones first tried fail."). Moreover, plaintiff fails to explain how this case is governed by the body of law that addresses single-speaker permitting requirements.

Next, plaintiff contends that Judge Mason "improperly distinguished" *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002), from the present case. Plaintiff relies on *Watchtower* in arguing that the Ordinance prevents plaintiff from engaging in "anonymous speech" and "spontaneous speech." (R. 70, Pl.'s Objections at 21–23.) The *Watchtower* plaintiffs challenged the Village of Stratton, Ohio's ordinance that made it a misdemeanor to engage in door-to-door advocacy without first registering with the mayor and obtaining a permit. 536 U.S. at 153, 122 S.Ct. 2080. The Supreme Court held that the ordinance was invalid because it was unprecedented in covering so much speech, including religious and political speech; burdened anonymous speech; "effectively banned" a significant amount of spontaneous speech; and was not tailored to the Village's stated interests in preventing fraud and crime and protecting residents' privacy. *Id.* at 164–69, 122 S.Ct. 2080.

This Court agrees with Judge Mason that *Watchtower* does not guide our analysis of the Peddler's License Ordinance. *Watchtower* is highly fact-specific, and the ordinance at issue there targeted different activity. Furthermore, the Supreme Court made the following statement in *Watchtower*: "Had this provision been construed to apply only to commercial activities and the solicitation of funds, arguably the ordinance would have been tailored to the Village's interest in protecting the privacy of its residents and preventing fraud." 536 U.S. at 165, 122 S.Ct. 2080. The Peddler's License Ordinance serves to advance the City's asserted interests in ensuring public safety and the payment of taxes and the prevention of fraud. There is greater potential for fraud in the act of peddling than in the act of speech alone. And the *Watchtower* Court recognized that the preclusion of complete anonymity "may well be justified in some situations— for example, ... by the interest in preventing fraudulent commercial transactions." 536 U.S. at 167, 122 S.Ct. 2080. The Ordinance's burden on anonymity is justified in light of the interests served. Its minimal burden on spontaneous speech is similarly justified.

Plaintiff's final argument is that the Ordinance unconstitutionally imposes a $100 fee for a two-year peddling license, thereby promoting "economic favoritism." [19] (R. 70, Pl.'s Objections at 23–25.) The Court agrees with Judge Mason that plaintiff's argument is without merit and warrants no further discussion.

Plaintiff has failed to show a likelihood of success on the merits on its claim that the Peddler's License Ordinance violates the First Amendment. Accordingly, the Court need not discuss the remaining elements of the preliminary-injunction analysis.

## CONCLUSION

For the reasons explained above, the Court adopts Magistrate Judge Mason's Report and Recommendation of July 29, 2015 [63] (as amended on August 28, 2015 solely to add citations to hearing transcripts [78]) in its entirety and denies plaintiff's motion for a preliminary injunction [33]. A status hearing is set for October 8, 2015 at 9:30 a.m.

**SO ORDERED.**

### *AMENDED REPORT AND RECOMMENDATION* [1]

MICHAEL T. MASON, United States Magistrate Judge

**To: The Honorable Jorge L. Alonso United States District Judge**

Currently pending before the Court is plaintiff Left Field Media's motion for preliminary injunction [33]. Left Field publishes a magazine called *Chicago Baseball*, which vendors offer for sale at home Cubs games primarily on the streets immediately adjacent to Wrigley Field. Plaintiff seeks to enjoin the City of Chicago from enforcing two of its peddling ordinances. For the reasons explained below, the Court respectfully recommends that the District Court deny plaintiff's motion for preliminary injunction.

## I. Background

### A. Procedural History

On April 8, 2015, Left Field initiated this action against the City and former Commander of the 19th District, Elias Voulgaris ("Commander Voulgaris"), seeking declaratory and injunctive relief. In its complaint, plaintiff brings First Amendment Challenges to three sections of the Chicago Municipal Code: Section 4–244–030, which prohibits all peddling on the public ways without a peddler's license (Count I); Section 4244–140, which prohibits all peddling on the public ways immediately adjacent to Wrigley Field (Count II); and Section 10–8–520, which exempts newspapers from the general prohibitions on peddling (Count III). In Count IV, plaintiff asserts his claims against Commander Voulgaris in his individual capacity.

After initiating this action, plaintiff quickly filed its motion for a temporary restraining order [5]. On April 10, 2015, the District Court granted plaintiff's motion and entered an order barring the City and Commander Voulgaris from interfering with plaintiff's access to the public sidewalks adjacent to Wrigley for purposes

---

19. A discounted $50 fee is available to veterans, those with physical disabilities, and those 65 years of age or older. (7/10/15 Hr'g Tr. 24–25.)

1. As stated in the initial Report and Recommendation [63], at the time of issuance, the Court did not have the benefit of the final official transcripts from the preliminary injunction hearing. This Amended R & R includes citations to the proper page numbers of those official transcripts. Footnote 4 of the initial R & R was also removed as it related solely to the issue of transcript citation. Nothing else has been changed, and the substance of the R & R remains the same.

of selling *Chicago Baseball* [9]. The TRO has been extended on a few occasions so that these preliminary injunction proceedings could be resolved.[2] The preliminary injunction hearing was held before this Court on June 16, July 10, and July 21, 2015.[3]

### B. Relevant Municipal Code Sections

In these preliminary injunction proceedings, plaintiff seeks to enjoin the defendants from enforcing the peddler's license requirement set forth in Section 4–244030 and the no peddling zone surrounding Wrigley under Section 4–244–140.

Section 4–244–030 provides in relevant part: "It shall be unlawful for any person to engage in the business of a peddler without first having obtained a street peddler license under this chapter." A "peddler" is defined as "any individual who, going from place to place, whether on private property or on the public way, sells, offers for sale, sells and delivers, barters or exchanges any goods, wares, merchandise, wood, fruits, vegetables or produce from a vehicle or otherwise." Municipal Code of Chicago § 4244–010.

Section 4–244–140 governs peddling in the vicinity of Wrigley Field and provides:

No person shall peddle any merchandise on the sidewalk immediately adjacent to Wrigley Field; such sidewalk consisting of the north side of Addison Street, the east side of Clark Street, the south side of Waveland Avenue, and the west side of Sheffield Avenue. For purposes of this subsection (b), the term "sidewalk" shall mean that portion of the public way extending from the perimeter of the Wrigley Field stadium structure to the street curb or curb line.

Section 10–8–520 exempts newspapers from the peddling restrictions, stating "[n]o person, other than a licensed peddler ... shall sell, offer or expose for sale, or solicit any person to purchase any article or service whatsoever, except newspapers, on any public way." [4]

### C. Factual History

Left Field Media is owned by Matthew Smerge. (Pl.'s Mot. at Ex. 1, Smerge Decl. ¶ 2; 6/16/15 Hr'g Tr. 21.) Smerge currently serves as the publisher and editor of *Chicago Baseball,* which is released four times a year during the major league baseball season. (Smerge Decl. ¶ 2; 6/16/15 Hr'g Tr. 21–22.) For 19 years, *Chicago Baseball* has served as an alternative to the official Chicago Cubs program, offering news, analysis, and criticism about the team. (Smerge Decl. ¶ 3; 6/16/15 Hr'g Tr. at 23–24.)

The magazine is sold exclusively before Cubs home games. (Smerge Decl. ¶ 4; 6/16/15 Hr'g Tr. at 24.) Smerge, along with anywhere from two to eight other vendors (depending on the game), sell the magazine for $2.00 a piece on the public sidewalks immediately adjacent to Wrigley Field.[5] (6/16/15 Hr'g Tr. at 25–29.) Smerge, who sells the magazine during

---

**2.** The parties also agreed to delay the briefing on defendants' pending motion to dismiss Counts I, III, and IV[24].

**3.** The parties initially indicated that the preliminary injunction hearing would only take one day. Clearly, that was not the case. Additionally, the vacation schedules of attorneys for both parties (which the Court was happy to accommodate) did contribute to some scheduling delays from the outset. The

Court's unavoidable responsibilities during two weeks of criminal duty also led to further delay in scheduling.

**4.** Plaintiff does not seek to enjoin the enforcement of the newspaper exemption at this time.

**5.** From 1996 through the 2014 season, the magazine was sold for $1.00. (6/16/15 Hr'g Tr. at 25–26.)

most night and weekend games, typically stands on the public sidewalk on the northeast corner of Clark and Addison. (Smerge Decl. ¶ 5; 6/16/15 Hr'g Tr. at 30.) Another vendor mans the northwest corner of Addison and Sheffield. (Smerge Decl. ¶ 6; 6/16/15 Hr'g Tr. at 92.) At times, two other vendors provide back up at those two busy corners of Clark and Addison and Addison and Sheffield. (6/16/15 Hr'g Tr. at 31, 132–133.) When available, other vendors are scattered to other corners surrounding Wrigley, and occasionally, to corners across the street. (Id. at 91–92, 102103.) The vendors typically take their positions 15–30 minutes before the Wrigley gates open and sell through the end of the first inning.[6] (Id. at 24.)

Each vendor dons a yellow shirt displaying the *Chicago Baseball* logo on the front and back, and carries anywhere from 50–150 magazines in an over-the-shoulder satchel. (6/16/15 Hr'g Tr. at 29, 32–33; Pl.'s Hr'g Exs. 18(a) & (b).) The vendors are entirely mobile and do not place anything on the ground while they sell the magazines. (6/16/15 Hr'g Tr. at 33–34.) Smerge testified that he always stands on the public sidewalk within about five feet of the curb and tries to train his vendors to sell in the same manner as he does. (Id. at 34–35.) Vendors work purely on a commission basis and retain 50% of their sales. (Id. at 35–36.) Neither Smerge nor any other *Chicago Baseball* vendor has ever applied for a peddler's license. (Id. at 36.) According to Smerge, he did not believe that he was required to obtain a peddler's license due to the exemption for

newspapers in the Municipal Code.[7] (Id. at 36, 87–88.)

In 1996, the first year that the magazine was published, all of the *Chicago Baseball* vendors were apparently arrested and charged with peddling without a license. (Smerge Decl. ¶ 8.) Ultimately, the City dismissed the charges. (Id.) According to Smerge, following that incident, *Chicago Baseball* vendors sold the magazine during every home game without any run-ins with the Chicago Police until 2013. (Smerge Decl. ¶ 9.)

On opening day of the 2013 season, shortly after the gates opened, Commander Voulgaris approached Smerge while he was selling magazines on the corner of Clark and Addison. (6/16/15 Hr'g Tr. at 37.) Voulgaris advised Smerge that he was in a no peddling zone and must move across the street to sell the magazine. (Id.) Smerge responded that he had a First Amendment right to be there, but Voulgaris persisted, telling Smerge he would be arrested or ticketed if he did not move across the street. (Id. at 37–38.) To avoid arrest or citation, Smerge moved across the street to the southeast corner of Clark and Addison. (Id. at 38.) That day he sold under 100 magazines, a "very low total for an opening day." [8] (Id. at 38–39.)

Smerge informed Jay Roper, the publisher of the magazine at the time, about his run-in with Voulgaris. (6/16/15 Hr'g Tr. at 39.) The next day Smerge and Roper composed a letter to Commander Voulgaris expressing their belief that the *Chicago Baseball* vendors had a First Amendment right to sell the magazines on

---

6. Gates open two hours prior to each game. (6/16/15 Hr'g Tr. at 24.)

7. Admittedly, Smerge has not looked at the Municipal Code recently and has only "glanced [at it] over the years." (6/16/15 Hr'g Tr. at 88.)

8. Other than tracking Left Field's total revenue, Smerge does not maintain records of the number of magazines each vendor sells during each game. (6/16/15 Hr'g Tr. at 99–100, 103.) He estimated that Left Field has sold anywhere from 30,000 to 50,000 magazines per season over the past several seasons. (Id. at 80.)

the sidewalks directly outside of Wrigley Field. (*Id.;* Pl.'s Hr'g Ex. 1.) Smerge hand delivered the letter to the 19th District, but never received a response. (6/16/15 Hr'g Tr. at 40–41.) For the remainder of the 2013 season, the *Chicago Baseball* vendors resumed selling magazines on the sidewalks adjacent to Wrigley without incident. (*Id.* at 41–42.)

On opening day in 2014, Voulgaris again approached Smerge while he was selling the magazine on the sidewalk on the northeast corner of Clark and Addison and told him he needed to move across the street and out of the no peddling zone. (6/16/15 Hr'g Tr. at 43.) In response, Smerge asked Voulgaris if the vendors could sell the magazines just off the curb in the street, which Smerge viewed as a better option than moving across the street. (*Id.* at 43–44.) Voulgaris approved. (*Id.*) So on that day, and for approximately the next three months, the vendors sold the magazine in the street, just off the curb of the sidewalks adjacent to Wrigley. (*Id.* at 44.) Smerge testified that the street position might have hurt sales "a little bit." (*Id.*)

At some point in June of 2014, Voulgaris informed one of the *Chicago Baseball* vendors that he may require all of the magazine vendors to move across the street. (6/16/15 Hr'g Tr. at 44.) Upon learning this, Smerge sent an e-mail to Voulgaris explaining his belief that the *Chicago Baseball* vendors had a First Amendment right to sell the magazine on the sidewalks surrounding Wrigley Field. (*Id.* at 45, Pl.'s Hr'g Ex. 2.) Smerge did not receive a response, but the next day Voulgaris approached one of the vendors and told him that he could resume selling magazines on the sidewalks adjacent to Wrigley. (6/16/15 Hr'g Tr. at 45–46.) All of the vendors did so for the remainder of the 2014 season without incident. (*Id.* at 46.)

On opening day in 2015, Voulgaris stopped Smerge while he was approaching his typical position at the northeast corner of Clark and Addison. (6/16/15 Hr'g Tr. at 4647.) Voulgaris told Smerge that all of the *Chicago Baseball* vendors needed to move across the street and that he would be ticketing any vendor he saw on the Cubs side of the street. (*Id.* at 47.) Despite this warning, Smerge began to sell magazines from his usual spot. (*Id.*) About a half hour later, Voulgaris issued Smerge a ticket for selling *Chicago Baseball* in a no peddling zone in violation of Section 4–244–140. (*Id.* at 48; Pl.'s Hr'g Ex. 3.) Voulgaris also warned Smerge that if he didn't move across the street he would be arrested. (6/16/15 Hr'g Tr. at 49.) Smerge moved across the street to the southeast corner of Clark and Addison, where he claims his sales were "reduced significantly." (*Id.*) Specifically, Smerge testified that before he moved, he sold 75 magazines in approximately a half hour. (*Id.*) After moving across the street, he sold about the same amount in two hours. (*Id.*) This action was filed three days after Voulgaris issued Smerge the citation.

At the hearing before this Court on 6/16/15, Commander Voulgaris provided testimony regarding his interactions with Smerge and other *Chicago Baseball* vendors. Unfortunately, Commander Voulgaris suffered a medical emergency and was unable to resume his testimony at the continued hearing dates. Because the City was unable to cross-examine Voulgaris, his testimony was stricken and the City was given leave to call Sergeant Evangelos Hitiris, also of the 19th District, over plaintiff's objection.

Sergeant Hitiris is in charge of the unit of six officers that are responsible for patrolling the area surrounding Wrigley Field on game days. (7/21/15 Hr'g Tr. at 5–6.) After each game, Sergeant Hitiris

and his unit tally how many tickets were issued in the area. (*Id.* at 10–11.) He explained that in 2014, approximately 968 tickets were issued. (*Id.* at 11.) Those tickets were for various offenses, including drinking on the public way, fights, ticket scalping, and peddling in a no peddling zone and/or without a license. (*Id.*) Sergeant Hiritis identified a number of tickets that were issued by his unit in 2014 to individuals peddling various items, including *Streetwise* magazines and t-shirts near Wrigley. (*Id.* at 21–24; Defs.' Hr'g Ex. 11.) He explained that he and his officers do not immediately give individuals tickets for violating an ordinance, but try to "start off the beginning of the year with giving everybody a warning." (7/21/15 Hr'g Tr. at 24.)

As for *Chicago Baseball* vendors, Hitiris testified that in 2013, there was some uncertainty in the 19th District as to whether they fell under the no peddling zone ordinance. (7/21/15 Hr'g Tr. at 26.) Voulgaris told Hitiris that he was "seeking clarification" on the issue. (*Id.*) As a result, Hitiris and his officers did not enforce the ordinance against the *Chicago Baseball* vendors in 2013. (*Id.*)

Like Smerge, Sergeant Hitiris testified that at some point during the 2014 season, the officers and the *Chicago Baseball* vendors reached a compromise whereby the vendors could stand in the street to sell the magazine. (*Id.* at 27–28.) During the current season, after the TRO was entered, Sergeant Hitiris has asked some *Chicago Baseball* vendors to "move to the side" so that they were not obstructing the sidewalk. (*Id.* at 50–51.)

## II. Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). A plaintiff seeking a preliminary injunction must show he has a likelihood of success on the merits, and that he has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied. *Stuller v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir.2012). If the moving party meets these threshold requirements, the court "must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Id.* The court also must consider the public interest in granting or denying an injunction. *Id.*

## III. Analysis

### A. Likelihood of Success on the Merits

The first element of a preliminary injunction requires that the plaintiff show a likelihood of success on the merits. In First Amendment cases, the likelihood of success on the merits will often be the determinative factor because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and because "injunctions protecting First Amendment freedoms are always in the public interest." *ACLU v. Alvarez*, 679 F.3d 583, 589–590 (7th Cir.2012) (quotations omitted).

#### 1. No Peddling Zone Requirement

 Plaintiff challenges the constitutionality of the no peddling zone ordinance as it relates to "speech peddling" on the streets immediately adjacent to Wrigley Field on First Amendment grounds. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, or of the press." U.S. Const. Amend. I. The First Amendment affords protection from state action by way

of the Fourteenth Amendment. U.S. Const. Amend. IV.

The parties and the Court agree that plaintiff's sale of *Chicago Baseball* falls within the scope of the First Amendment. The fact that the magazine is offered for sale instead of given away does not lessen plaintiff's right to constitutional protection. "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). Further, although some may not view the content of *Chicago Baseball* as pertinent as do the bleacher bums at Wrigley Field, the Seventh Circuit recently rejected the idea that sports reporting deserves lesser protection under the First Amendment. *Wis. Interscholastic Athletic Ass'n v. Gannett Co., Inc.*, 658 F.3d 614, 625 (7th Cir.2011) ("There is no basis for a rule that makes the press's right to coverage depend on the purported value of the object of their coverage."). And of course, at issue here are the public sidewalks, long thought to be a "hallmark[ ] of a traditional public forum." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1035 (7th Cir.2002) (quoting *Frisby v. Schultz*, 487 U.S. 474, 480, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988)). *See also McCullen v. Coakley*, —— U.S. ——, 134 S.Ct. 2518, 2529, 189 L.Ed.2d 502 (2014) (noting that sidewalks "occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate.") (quotation omitted).

Even in such a public forum as the sidewalks surrounding Wrigley Field, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). The parties agree that this is the appropriate framework to assess the City ordinances at issue here.[9]

To begin, we must determine whether the no peddling zone ordinance is content-neutral. "Government regulation of expressive activity is content-neutral so long as it is justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791, 109 S.Ct. 2746 (quotations omitted). Here, plaintiff argues that the no peddling zone ordinance is content-based because newspapers are exempted from the City's peddling regulations. As did the Seventh Circuit in *Weinberg v. City of Chicago*, 310 F.3d 1029, we would recommend that the District Court reject plaintiff's argument on this point.

In *Weinberg*, the Court addressed whether the City's 1,000 foot ban on peddling surrounding the United Center violated the First Amendment.[10] As discussed in more detail below, the Court ultimately answered that question in the affirmative. However, the Court expressly rejected the notion that the newspaper exemption rendered the United Center peddling ban content-based. In doing so, the Court noted that such differential

---

**9.** We note that the City hasn't argued that *Chicago Baseball* magazine amounts to commercial speech and is subject to a different standard.

**10.** Interestingly, the plaintiff in *Weinberg* serves as one of Left Field's attorneys in this matter.

treatment "is unconstitutional only if it 'is directed at, or presents the danger of suppressing, particular ideas.'" *Weinberg,* 310 F.3d at 1035 (quoting *Leathers v. Medlock,* 499 U.S. 439, 453, 111 S.Ct 1438, 113 L.Ed.2d 494 (1991)). Although *Weinberg* involved the sale of a book, a transaction the Court deemed likely to be more disruptive than the sale of a fifty cent newspaper, the Court's rationale can still be applied here. While the sale of a magazine is arguably more akin to the sale of a newspaper, it simply does not appear that the City's exemption for newspapers, but not magazines, was an attempt "to suppress a certain message or viewpoint." *Weinberg,* 310 F.3d at 1036.

[30, 31] Notwithstanding the newspaper exemption issue, the no peddling zone ordinance should be otherwise deemed content-neutral despite some recent uncertainty on the topic. *See Norton v. City of Springfield,* 768 F.3d 713, 717 (7th Cir. 2014) ("We do not profess certainty about our conclusion that the ordinance is content-neutral."). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward,* 491 U.S. at 781, 109 S.Ct. 2746. As recently explained by the Seventh Circuit, the Supreme Court has classified two types of regulations as content-based: (1) those that restrict speech because of the idea it conveys, and (2) those that restrict speech because the government disapproves of its message. *Norton,* 768 F.3d at 717. The no peddling zone simply does not fit into either category.

■ According to the Alderman of the 44th Ward, Tom Tunney, and as discussed in more detail below, the City adopted the no peddling ordinance to alleviate congestion and ensure public safety on the sidewalks and streets surrounding the stadium after receiving complaints from local residents and business owners. The ordinance is silent as to content and serves as a general ban on the sale of all merchandise (again, except newspapers), regardless of the message being conveyed. In other words, the ordinance regulates where vendors peddle, not what they peddle. *See McCullen,* 134 S.Ct. at 2531 ("Whether petitioners violate the Act depends not on what they say, but simply on where they say it.") (quotations omitted). It applies equally to a vendor selling a bag of peanuts as it does to a vendor selling a magazine; it applies equally to a vendor selling a Cubs magazine as it would to a vendor selling a White Sox magazine. And, while one could argue that the no peddling zone ordinance at Wrigley has the incidental effect of limiting sports related speech, "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." *Id.* As such, we would recommend that the District Court determine that the no peddling ordinance is content-neutral.

That being said, we turn to whether the ordinance is narrowly tailored to serve a significant governmental interest and whether it leaves open ample alternative channels for communication of the information. The governmental interest here is clear. As maintained by the City, the no peddling zone was enacted in order to alleviate congestion and ensure public safety. Such interests have long been considered significant. *McCullen,* 134 S.Ct. at 2535 (recognizing the legitimacy of the government's interest in ensuring public safety and order and promoting the free flow of traffic on streets and sidewalks); *Heffron v. Int'l Soc. for Krishna Consciousness,* 452 U.S. 640, 650, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) ("As a general matter, it is clear that a State's interest in

protecting the safety and convenience of persons using a public forum is a valid governmental objective"). More importantly, the testimony and objective evidence submitted in the record support the City's assertion that the ordinance in fact serves to advance its interests.

At the outset, it is worth noting that Wrigley Field, though an institution, creates unique problems for the City. Not only does it stand directly in the middle of a bustling residential and commercial neighborhood with minimal parking, but unlike other sports complexes here in the city or elsewhere, it leaves a very small footprint. (7/10/15 Hr'g Tr. at 100.) According to testimony from Alderman Tunny, most stadiums have up to thirty acres of land to work with, whereas Wrigley Field occupies only about three acres. (*Id.*) Couple that small footprint with the tens of thousands of eager Cubs fans trying to get to the stadium on foot, by car, or by public transportation, and the City is left attempting to manage the area while still protecting the Constitutional rights of its citizens.[11]

Alderman Tunney testified that prior to his proposal of the 2006 no peddling zone ordinance, he received numerous complaints regarding peddlers and street performers. Specifically, he received complaints that people were unable to enter the stadium in a safe manner and at times had to walk in the street. (7/10/15 Hr'g Tr. at 102.) He also received complaints that peddlers were blocking peoples' ability to traverse up and down the streets. (*Id.*) Alderman Tunny further testified that prior to the introduction of the no peddling ordinance he held meetings with members of the community, including peddlers and street performers. (*Id.* at 104–

05.) At those meetings, the Alderman received additional complaints regarding access to the stadium and the inability to differentiate between Cubs property and the public sidewalks surrounding Wrigley. (*Id.* at 105.) Also raised at those meetings were concerns regarding the sale of counterfeit merchandise and the conduct of the peddlers. (*Id.* at 105–106.) All of this led to the introduction of the 2006 no peddling ordinance at issue here. (*Id.* at 106.)

Also submitted with the parties' briefs and at the hearing were video recordings of the areas surrounding Wrigley before and during various Cubs games this season. While those videos provide snapshots of only a few games, and at times show a varying number of fans near the stadium (*compare* Pl.'s Hr'g Ex. 6 *with* Defs.' Hr'g Ex. 2(a)), they clearly illustrate that the public sidewalks, which are particularly narrow in some places, can get extremely congested. Fans, coming from all directions, are funneled into the busy entrances at Clark and Addison and Sheffield and Addison. At times, pedestrians walk in Addison street, which remains open to vehicular traffic before games. (Defs.' Hr'g Ex. 2(c) & (d).) Another video shows people exiting a City bus and beginning to form long lines for bag inspection starting on Cubs property and extending all the way back to the City sidewalks. (Defs.' Hr'g Ex. 2(b).) The videos also show *Chicago Baseball* vendors attempting to sell magazines on the sidewalks immediately adjacent to Wrigley, at times, in very congested areas of pedestrian traffic. (Defs.' Hr'g Ex. 2(d).) Fans can be observed walking around those vendors while they are either making a sale or attempting to make a sale. (*Id.*) Sergeant Hitiris also

---

11. Recently, construction at Wrigley has caused even more problems due to the closure of certain streets and sidewalks. As Alderman Tunney explained, the City has permanently vacated the sidewalks immediately adjacent to Wrigley on Waveland and on Sheffield. (7/10/15 Hr'g Tr. at 122.) Those sidewalks are now Cubs property.

testified that he has told *Chicago Baseball* vendors to move to the side so as not to obstruct the sidewalk. (7/21/15 Hr'g Tr. at 51.)

The evidence before the Court here can be distinguished from that presented by the City in *Weinberg*, 310 F.3d 1029. Again, in that case, the 7th Circuit struck down the City's 1,000 foot ban on peddling surrounding the United Center. The Court took issue with the lack of objective evidence demonstrating that plaintiff (selling a book), or any other peddler, created the problems of congestion asserted by the City in support of the ordinance. *Id.* at 1040. The Court gave little weight to what it viewed as "self-serving" testimony of police officers and security officials in light of a video tape showing that plaintiff's sale of his book did not interfere with pedestrian traffic and that the sidewalks were not in fact congested. *Id.* at 1039. That is not the case here. Not only do we have the testimony of both Alderman Tunney and Sergeant Hitiris (self-serving may it be), but the video recordings from a few different game days show congestion on the sidewalks around Wrigley and *Chicago Baseball* vendors contributing to that congestion.[12]

It naturally follows that other vendors, whether they be peddling magazines, t-shirts, or peanuts would contribute to the congestion were the ordinance not in effect. We note that plaintiff distinguishes itself and other "speech peddlers" from peddlers selling merchandise such as peanuts and t-shirts. According to the plaintiff, the City could, from a Constitutional standpoint, allow peddlers like itself selling printed matter to remain on the adjacent sidewalks, but require the peanut and t-

shirt vendors to remain across the street. But as the City points out, what constitutes a speech peddler is not as clear cut as plaintiff makes it out to be. In *Ayres v. City of Chicago*, 125 F.3d 1010 (7th Cir. 1997), the court addressed a plaintiff's challenge to a City ordinance prohibiting him from selling T-shirts advocating for the legalization of marijuana in the majority of the downtown area. In doing so, the Court noted that there was "no question that the T-shirts are a medium of expression prima facie protected by the free-speech clause of the First Amendment . . ." 125 F.3d at 1014. Thus, it is not so far-fetched to conclude that t-shirt vendors and other vendors might in fact fall under the ambit of plaintiff's "speech peddlers."

Plaintiff also argues that the under inclusive nature of the no peddling zone ordinance calls into question the City's supposed interest here. Plaintiff provides a laundry list of other activities it contends are permitted on the public sideways adjacent to Wrigley such as distributing fliers or free samples, charitable solicitation, and commercial photography. Plaintiff presented photographs of individuals passing out coconut water, selling raffle tickets, seeking charitable donations, and of "fanfoto" representatives taking pictures of fans in front of Wrigley and the statues. (Pl.'s Hr'g Exs. 4(a)-(e), 5(a)-(b), 7, & 9.) According to plaintiff, such activities provide the same potential for congestion as do the *Chicago Baseball* vendors, if not more. But, contrary to the plaintiff's steadfast assertion, the evidence does not indicate that all of those activities are in fact permitted to take place on the public sidewalks.

---

12. One could argue that the congestion that can still be seen this season, years after the no peddling zone ordinance was passed and the majority of peddlers moved across the street, shows that the City's ordinance does not ad-

vance its interests. But, again, the unique footprint of Wrigley Field makes it doubtful that there will ever come a time that those sidewalks surrounding the field are free of congestion.

First, no witness could say for certain whether those individuals depicted in the pictures were on the public way or on Cubs property. While Smerge maintained that he generally understood the red bricks spanning from the curb to be public sidewalk, Sergeant Hitiris was of the opinion that in some instances around the stadium the bricks are in fact on Cubs property.[13] (*Compare* 6/16/15 Hr'g Tr. at 84 *with* 7/21/15 Hr'g Tr. at 16–17, 57–58, 60.) According to Sergeant Hitiris, the Cubs allow "fanfoto" representatives to use their property to take pictures, and also allow certain charitable organizations to solicit on Cubs property. (7/21/15 Hr'g Tr. at 30–31, 57.) When Hitiris and his officers do see individuals soliciting charitable donations on the public way, they tell them to move to Cubs property or go across the street. (*Id.* at 30–31.) Hitiris and his officers also tell people passing out fliers to "stop and move along." (*Id.* at 62–63.) In any event, the fact that the no peddling ordinance does not cover every possible cause for congestion does not alone undermine the City's interest. *See Curtis v. Thompson*, 840 F.2d 1291, 1302 (7th Cir. 1988) ("Mere underinclusiveness does not, however, amount to constitutional infirmity."). All of this leads to a recommendation to the District Court that the City has a significant interest in alleviating congestion and ensuring public safety.

■ Having found the City has a significant interest, we turn to whether the no peddling ordinance is narrowly tailored to serve that interest. To be narrowly tai-

lored, an ordinance must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799, 109 S.Ct. 2746. "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency." *McCullen*, 134 S.Ct. at 2534–35 (quoting *Riley*, 487 U.S. at 795, 108 S.Ct. 2667). However, an ordinance need not be the "least restrictive or least intrusive" method for achieving the government's goal. *Milestone v. City of Monroe*, 665 F.3d 774, 784 (7th Cir.2011) (quoting *Ward*, 491 U.S. at 798–99, 109 S.Ct. 2746).

At the outset, we note that the 7th Circuit expressly opined in *Weinberg* that a peddling ban "on the sidewalks immediately surrounding the United Center" would be "less encompassing and less intrusive on First Amendment rights" than the 1,000 foot ban the Court found unconstitutional. 310 F.3d at 1040. Of course, that was dicta and related to the United Center, so we still must independently assess the ordinance and record before us here. After doing so, we recommend to the District Court that the ordinance is narrowly tailored.

The no peddling zone is limited in geographic scope and does not expand further than is necessary to serve the City's interest. It applies only to the public sidewalks immediately surrounding the stadium.[14] In enacting the ordinance, the City specifically chose to stay away from a 1,000 foot

---

13. Similarly, Smerge and Hitiris had a different response when asked about the width of the public sidewalks surrounding Wrigley. (*Compare* 6/16/15 Hr'g Tr. at 83–84 (10 feet) *with* 7/21/15 Hr'g Tr. at 1617 (six feet)).

14. Again, since the City has vacated the sidewalks on Waveland and Sheffield to the Cubs,

the no peddling zone ordinance only applies to the public sidewalks adjacent to the stadium along Addison and Clark, and to a portion of the corners at Clark and Waveland and Addison and Sheffield. (*See* Defs.' Hr'g Ex. 1(d).)

ban in order to burden less speech than was necessary. (7/10/15 Hr'g Tr. at. 106–107.) Later, in 2009, Alderman Tunny attempted, but was ultimately unsuccessful, at introducing an ordinance that would have covered the sidewalks on a greater number of blocks surrounding the stadium. (*Id.* at 107–108, 115; Defs.' Hr'g Exs. 1(c) & 9.) Such a large geographical scope would have certainly called into question whether that ordinance was narrowly tailored. However, as it stands now, the adjacent sidewalks ordinance is limited to the sidewalks where areas of congestion are increased as pedestrians funnel into the stadium entrances from different directions.

It is true, as plaintiff has argued, that Alderman Tunney and Sergent Hitiris testified as to the ease of enforcement of the blanket ban on peddling on the sidewalks surrounding Wrigley. Citing to *McCullen*, plaintiff argues that the City has simply taken the easiest approach, as opposed to a narrowly tailored approach. In *McCullen*, the Supreme Court examined a Massachusetts state law that set forth 35–foot buffer zones surrounding abortion clinics in order to prevent harassment, promote public safety, and prevent congestion. At various abortion clinics, the buffer zones essentially forced "sidewalk counselors" well-back from the clinic entrances, thereby seriously burdening their ability to convey their message. In striking down the law, the Court emphasized, among other things, that the State failed to consider a number of alternative measures available that would serve its interests, "without excluding individuals from areas historically open for speech and debate." *McCullen*, 134 S.Ct. at 2539.

Here, plaintiff suggests the City could use alternatives to the blanket ban such as enforcing the disorderly conduct statute already on the books, passing an ordinance targeting obstruction of the sidewalks, or limiting the number of peddlers on the sidewalks immediately adjacent to the Field. However, given the unique footprint at Wrigley and the undisputed congestion, permitting any peddlers, even in small numbers may leave the City unable to advance its significant interests. And even if the court accepted the plaintiff's proposed "less-speech-restrictive" alternatives as just that, a court need not deem an ordinance invalid where, as here, the means chosen are not substantially broader than necessary to achieve the City's interest. *Ward*, 491 U.S. at 800, 109 S.Ct. 2746.

Undoubtedly, the no peddling ordinance also leaves open ample alternative channels of communication for plaintiff and other peddlers and does not render their voices essentially mute as did the ordinance in *McCullen*. It is undisputed that peddling is permitted on the corners and streets immediately across from the stadium. Videos show that pedestrians come from all directions as they travel towards the field. While vendors may not have immediate access to fans exiting city buses and taxis, vendors remain in plain view and earshot of those fans and all of the other fans traversing the sidewalks towards the stadium. Loyal *Chicago Baseball* fans could certainly spot the bright shirts of the vendors just across the street and all vendors could capture the attention of their target audience. Though those streets and corners may not be the peddlers' preferred selling spots, that does not render the ordinance unconstitutional. *See Marcavage v. City of Chicago,* 659 F.3d 626, 631 (7th Cir.2011) (upholding a police directive for protestors to move across the street from Wrigley during the

Gay Games because protestors had "ample opportunity to capture the attention of the Games attendees"). In our view, the ordinance is narrowly tailored to serve the City's significant interest and leaves open ample alternative methods of communication.

For all of these reasons, we conclude that the plaintiff has not shown a likelihood of success on the merits as to the no peddling zone ordinance. Having reached this conclusion, we need not delve into the remaining threshold elements for a preliminary injunction and recommend that the District Court deny plaintiff's motion for a preliminary injunction as it relates to the no peddling zone ordinance. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1085–86 (7th Cir.2008) ("If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction.").

### 2. Peddling License Ordinance

Plaintiff also brings an as applied and facial challenge to Section 4–244–030, which, again, requires all peddlers to obtain a peddler's license from the City.[15] The license can be obtained through the City's Department of Business Affairs and Consumer Protection during regular business hours, usually in about an hour, and costs $100 for a two-year period.[16] (7/10/15 Hr'g Tr. at 17–19; 24.) Each individual vendor must have his own license and must display a badge that includes his name, picture, and license expiration date.

(*Id.* at 38, 51.) The peddler's home address is listed on the back side of the badge. (*Id.* at 38.) Relying primarily on *Watchtower v. Stratton*, 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002), plaintiff asserts an overbreadth challenge, arguing that the license requirement violates the First Amendment as it relates to printed matter because it inhibits one's ability to speak anonymously or spontaneously, and results in "economic favoritism."[17] We disagree.

The plaintiffs in *Watchtower* were various groups that coordinated and supervised the preaching efforts of Jehovah's Witnesses. Those plaintiffs facially challenged a Village of Stratton ordinance making it a misdemeanor to engage in door-to-door advocacy without first registering with the mayor and receiving a permit. In striking down the ordinance, the Court first recognized the "historical importance of door-to-door canvassing and pamphleteering as vehicles for the dissemination of ideas." *Watchtower*, 536 U.S. at 162, 122 S.Ct. 2080. The Court then took issue with the broad amount of speech that the ordinance covered, including non-commercial canvassing for religious, political, and other causes. *Id.* at 165–66, 122 S.Ct. 2080. Of further concern to the Court was the dampening effect the ordinance had on one's ability to speak anonymously and spontaneously. *Id.* at 166–68, 122 S.Ct 2080.

The peddling license scheme here can be distinguished from that in *Watchtower*. The ordinance does not involve activity

---

**15.** Though it is undisputed that neither Smerge nor any other vendors have ever applied for a peddler's license, the City has not expressly challenged plaintiff's standing to attack the ordinance.

**16.** A discounted fee of $50 is available to veterans, anyone with a physical disability, and anyone over the age of 65. (7/10/15 Hr'g Tr. at 24–25.)

**17.** We note that plaintiff has not asserted a prior restraint claim.

such as door-to-door canvassing, but instead targets the sale of merchandise, including printed matter (other than newspapers), on the public way. To be clear, the ordinance is content-neutral. "To qualify as content-neutral, a permit policy cannot invest 'unbridled discretion' in the person who decides whether a permit will issue because excessive discretion can lead to discriminatory enforcement." *Smith v. Executive Director of Indiana War Memorials Com'n,* 742 F.3d 282, 289 (7th Cir. 2014) (citations omitted). The ordinance affords the City minimal, if any, discretion in choosing to grant or deny an application for a peddler's license. The ordinance provides that the "commissioner of business affairs and consumer protection *shall issue* a peddler's license to an applicant who tenders a completed, accurate application and the appropriate fee, unless issuance of a license is prohibited under subsection (b)." Municipal Code of Chicago § 4–244–041(a) (emphasis added). Subsection (b) only bars the issuance of a license if the applicant is under 16, or if an applicant's previous license has been revoked within the previous year, or is otherwise suspended. John Castenada, a Supervisor at the Department of Business Affairs and Consumer, also explained that each applicant needs an Illinois Business Tax ID, and that City officials do check to ensure that an applicant is not in debt to the City (for parking tickets, water bills, etc.). (7/10/15 Hr'g Tr. at 23, 45–46.) Despite these additional requirements, the minimal discretion afforded the City under the current licensing scheme differs from the City's previous ordinance, which granted "unfettered discretion" to the City and which was held unconstitutional as a prior restraint in *Weinberg,* 310 F.3d at 1044.

More importantly, the City officials do not examine the content of items that ped-

dlers offer for sale. For example, if a peddler reported he intended to sell t-shirts, the City official would not examine the t-shirt or seek further specification as to any message on the shirt. (7/10/15 Hr'g Tr. at 49.) The fee is also the same no matter what item is being sold. Thus, there is no indication that the licensing ordinance serves to restrict certain speech due to its content.

The City also has a significant interest in promoting public safety, ensuring the payment of taxes, and providing a mechanism for policing fraudulent peddling activity. Even the *Watchtower* court recognized such interests as important. *See Watchtower,* 536 U.S. at 164–65, 122 S.Ct. 2080. The ordinance serves to advance those interests by ensuring each peddler has a Tax ID number and that a peddler can be contacted in response to customer complaints or in the case of fraudulent transactions. As it applies to magazines such as *Chicago Baseball,* the ordinance serves to ensure that individuals are not selling stolen or free magazines on the public way. Because the requirement that a peddler hold a license is aimed at commercial transactions, it is properly tailored to serve the City's interests here and not overly broad. *See Watchtower,* 536 U.S. at 165, 122 S.Ct. 2080 ("Had this provision been construed to apply only to commercial activities and the solicitation of funds, arguably the ordinance would have been tailored to the Village's interest in protecting the privacy of its residents and preventing fraud.").

Similarly, under this licensing scheme, plaintiff's complaints of a loss of spontaneity and anonymity fall short because the same concerns present in *Watchtower* regarding the broad amount of speech covered and the historical importance of door-

to-door canvassing are not at the forefront here. Like defendants, we also point out that the plaintiff has failed to advance any significant argument on its assertion of "economic favoritism."

For all of these reasons, we again conclude that the plaintiff has failed to show a likelihood of success on the merits as to the peddling license requirement and need not address the remaining threshold requirements for a preliminary injunction.

## IV. Conclusion

For the reasons stated above, we respectfully recommend that the District Court deny plaintiff's motion for preliminary injunction as to both ordinances at issue. Specific written objections to this Report and Recommendation may be served and filed within fourteen (14) days from the date that this order is served. Fed.R.Civ.P. 72. Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the Report and Recommendation. *Lorentzen v. Anderson Pest Control,* 64 F.3d 327, 330 (7th Cir.1995).

**Dated: August 28, 2015**